946 So.2d 1 (2006)
Wydell Jody EVANS, Appellant,
v.
STATE of Florida, Appellee.
Wydell Jody Evans, Petitioner,
v.
James R. McDonough, etc., Respondent.
Nos. SC05-1974, SC05-632.
Supreme Court of Florida.
October 5, 2006.
Rehearing Denied December 19, 2006.
*3 John W. Jennings Capital Collateral Regional Counsel, Richard E. Kiley, Assistant CCRC, and James V. Viggiano, Staff Attorney, CCRC, Middle Region, Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Wydell Jody Evans was convicted of first-degree murder and subsequently sentenced to death. He was also convicted of kidnapping and aggravated assault. We affirmed his convictions and sentences on direct appeal. Evans v. State, 838 So.2d 1090 (Fla.2002), cert. denied, 540 U.S. 846, 124 S.Ct. 121, 157 L.Ed.2d 84 (2003). Evans now appeals an order of the circuit court denying his motion for postconviction relief filed under Florida Rule of Criminal Procedure 3.851. He also petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons explained below, we affirm the circuit court's order and deny the habeas petition.

I. FACTUAL AND PROCEDURAL BACKGROUND
The following facts are taken from this Court's opinion on direct appeal:
On October 21, 1998, two days after being released from prison, Wydell Evans shot and killed his brother's seventeen-year-old girlfriend, Angel Johnson, during an argument over her alleged unfaithfulness to Evans' brother. At the time of the shooting, Evans was in an automobile with Johnson, Erica Foster, Sammy Hogan, and Lino Odenat. At some point during the argument, Johnson laughed, to which Evans responded, "You think it's funny? You think it's funny?" Evans then pulled out a gun and shot Johnson in the chest.
After the shooting, Evans directed Hogan to drive to the home of a man called "Big Dick." As they drove, Evans passed the gun to Odenat and told him to dispose of it. When they arrived at Big Dick's house, Evans left the car and talked to Big Dick. While Evans was talking, Odenat decided to get out of the car and let the others take Johnson to *4 the hospital. As Odenat opened the door and stepped out, Evans told him to get back into the car and Odenat obeyed. Within a few minutes, Evans returned and directed Hogan to drive into a nearby parking lot. There, Evans threatened Foster and Hogan not to tell who shot Johnson or he would kill them and their families. After threatening Foster and Hogan, Evans tried to wipe his fingerprints from inside the car and left with Odenat. Once Evans was out of the car, Foster and Hogan rushed Johnson to the hospital where she later died of her wounds.
At the hospital, Foster and Hogan were questioned by the police, at which time they first told police that a white man driving a cream-colored car shot Johnson over a drug deal. They later changed their story and reluctantly identified Evans as the shooter. The police found Evans at a motel the next morning. He was taken into custody, charged, and after a jury trial, convicted of one count of first-degree premeditated murder, one count of kidnaping and one count of aggravated assault.
Evans, 838 So.2d at 1092-93.
During the guilt phase of the trial, the defense's theory was that Evans accidentally shot Johnson while trying to hand the gun to her.[1] Odenat's trial testimony supported this. There was also evidence presented at trial that Evans had been drinking at the time of the shooting. Hogan testified that he and Evans had been drinking earlier that day, and Evans testified that he was slightly intoxicated but was aware of his surroundings and had a clear recollection of what took place in the car at the time of the shooting.
During the penalty phase, defense counsel presented no mental health mitigation. Instead, defense counsel called several character witnesses including Evans, his mother, Lily Evans, and his aunt, Sandra Evans.[2] These witnesses gave positive accounts of Evans, describing him as a generous man, a good father, a loving and obedient son and grandson, a good friend, and someone who counseled children to stay out of trouble by staying in school. In addition, Lily told the jury that Evans had been an obedient child who was good in school, but that her addiction to crack cocaine had affected his behavior. She also told the jury that Evans had been her inspiration in deciding to stop abusing cocaine. Evans also testified that his mother's addiction adversely affected him.
The jury recommended the death penalty by a vote of ten to two. The trial judge followed the jury's recommendation, finding two aggravating circumstances: (1) Evans had been convicted of prior violent felonies; and (2) the crime was committed while Evans was on probation. Evans, 838 So.2d at 1097. Although Evans did not request an instruction on any of the statutory mitigators, the trial court considered each statutory mitigator in its sentencing order and found that none applied. The trial court also found several nonstatutory mitigating circumstances based in part on the character evidence presented during the penalty phase. Evans, 838 *5 So.2d at 1093, 1097.[3] In addition to his death sentence, Evans was sentenced to life imprisonment on the kidnapping count and to a concurrent sentence of 108.15 months with a three-year mandatory minimum term on the aggravated assault count. Id. at 1092.
In May 2001, Evans filed his direct appeal, and in November 2002, this Court issued its decision affirming Evans' convictions and sentences. Id. at 1099.[4] His convictions and sentences became final in 2003. See Evans v. Florida, 540 U.S. 846, 124 S.Ct. 121, 157 L.Ed.2d 84 (2003) (denying petition for writ of certiorari). On February 26, 2004, Evans filed a rule 3.851 motion for postconviction relief in circuit court raising ten claims, several of which centered upon defense counsel's failure to discover that Evans suffered a closed head injury at age three.[5] An evidentiary hearing was held on October 19 and 20, 2004, and December 16, 2004. At the evidentiary hearing, Evans presented the testimony of five lay witnessesLily Evans, Sandra Evans, Oren Evans, Margaret O'Shaunessy, and Barbara McFadden; the testimony of three mental health expertsDr. Richard Carpenter, Dr. Harry A. McClaren, and Dr. Henry Dee; and the testimony of defense counsel, Kenneth Studstill. Evans also testified.
On February 15, 2005, the trial court issued an order denying each of Evans' claims. Evans now appeals this order and petitions this Court for a writ of habeas corpus.[6]

*6 II. RULE 3.851 MOTION FOR POSTCONVICTION RELIEF
Evans raises three ineffective assistance of counsel claims. First, he claims trial counsel was ineffective during the guilt phase for failing to investigate, prepare, and present the defense of diminished capacity. Second, Evans claims that trial counsel was ineffective at the penalty phase for failing to adequately challenge the State's case. Specifically, Evans claims (a) counsel was ineffective for failing to request the appointment of co-counsel to assist in investigating and presenting a case in mitigation during the penalty phase; and (b) counsel was ineffective for failing to adequately investigate Evans' background and discover available mental health mitigation.[7] Finally, Evans claims counsel was ineffective during the penalty phase for failing to request jury instructions on the statutory mental health mitigators based on evidence that Evans was drinking at the time of the murder.[8]
Because each of Evans' ineffective assistance claims alleges that counsel failed to investigate and present mental health mitigation, we turn first to the testimony and evidence presented at Evans' evidentiary hearing regarding his mental health at the time of the crime. We then address each of Evans' claims of ineffective assistance. Ultimately, we affirm the trial court's denial of these claims.

A. Evidentiary Hearing
At the evidentiary hearing, Evans presented evidence of a troubled childhood. He presented his school and medical records, which demonstrated that he was hit by a car and was diagnosed with a closed head injury at the age of three.[9] His mother, Lily, and his aunt, Sandra, witnessed the accident and testified that he stopped breathing for at least a minute after it occurred. They also testified that his speech and language patterns changed, and he began to stutter. In addition, Evans' life at home was difficult. His father died when he was young, and he grew up with a mother who was addicted to crack cocaine and a stepfather who was abusive. As a result of his stuttering and difficulties at home, Evans was frequently picked on and beaten up by neighborhood children. He eventually retaliated and started fighting frequently. Lily testified that his temper "became pretty quick." Evans' brother, Oren, testified that Evans was very aggressive and recalled instances of Evans throwing rocks at a police officer.
Evans' school records showed a history of speech and learning disabilities, as well as escalating behavioral problems due to anger and aggression. In elementary school, Evans was placed in a class for children with learning disabilities and received speech therapy. While Evans' IQ tested in the normal range, disparities between his verbal and performance scores on the test indicated severe learning disabilities. Evans received mostly failing *7 grades. In addition to academic problems, Evans was regularly disciplined for being disruptive and, as he got older, was frequently expelled from school for fighting. Evans' violent behavior escalated from being aggressive with other students to being aggressive with a teacher. He was eventually classified as emotionally handicapped and was recommended for the severely emotionally disturbed program in high school, a program for the most violent students. School psychology reports described Evans as having poor impulse control, displaying excessive aggression, and having difficulty controlling anger. At the evidentiary hearing, Evans' high school teacher, Barbara McFadden, and counselor, Margaret O'Shaunessy, also described Evans as angry, violent, impulsive, and having an explosive temper.
When he was sixteen, Evans dropped out of school, having already begun to establish a criminal record involving violent crimes. Evans was twenty-eight years old when he shot Johnson. By that time, he had served eight to nine years in prison and juvenile detention facilities,[10] and was on probation for two separate felony convictions.[11] At the evidentiary hearing, Evans described himself as a "jack boy" because he robs drug dealers for a living and testified that he only feels "ready" when strapped with a gun. In addition, Oren described Evans as one of the meanest and most aggressive people he had ever known and recalled instances where Evans would hit women.
All of the defense witnesses at the evidentiary hearing said they would have testified at Evans' trial had they been asked. Only one of these lay witnesses, Lily, was contacted by counsel and asked to testify during the penalty phase. Sandra testified at the penalty phase but only after appearing on her own and speaking with defense counsel. Both Lily and Sandra testified that they were told by defense counsel to say only good things about Evans at the penalty phase. Sandra testified that she did not discuss Evans' head injury with defense counsel.
In addition to the lay witness testimony, three mental health experts testified at the evidentiary hearing. Evans' two experts, Dr. Richard Carpenter and Dr. Henry Dee, and the State's expert, Dr. Harry A. McClaren, testified that Evans had brain damage attributable to his head injury. They agreed that the difference between Evans' verbal and performance scores on his IQ test indicated possible brain damage as further evidenced by his learning disabilities. In addition, they all agreed that based upon his self-reporting, Evans had abused alcohol throughout his life. Dr. Carpenter testified that Evans told him that he started abusing alcohol at age twelve, and Dr. McClaren testified that Evans told him that he was intoxicated each time he was arrested, starting at age thirteen. Finally, the experts generally agreed that Evans' behavior at the time he shot Johnson was indicative of antisocial personality disorder. Both Dr. Carpenter and Dr. McClaren characterized Evans as narcissistic and not wanting to admit anything that puts him in a bad light.[12]
However, Dr. Carpenter and Dr. Dee departed from Dr. McClaren over whether *8 Evans' brain damage led to any particular behavior. Dr. Carpenter and Dr. Dee believed that Evans suffered from an uncontrollable rage reaction or impulse disorder as a result of the brain damage. They agreed that at the time Johnson was killed, Evans' behavior demonstrated that he was experiencing an uncontrollable rage reaction, which was further exacerbated by his alcohol use. Specifically, Dr. Carpenter testified that Evans' behavior at the time of the shooting was due to alcohol abuse, impulse disorder, and rage reaction secondary to Evans' closed-head injury.[13] Dr. Dee testified that Evans' alcohol use exacerbated his brain damage, causing Evans to experience an instantaneous rage known as "clicking."[14] Neither expert believed Evans formed the intent to kill Johnson.[15] Rather, both experts testified that because of his impulse disorder, Evans was under the influence of extreme mental or emotional disturbance at the time of the offense and that Evans' capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired at the time of the offense.
While Dr. McClaren agreed that Evans suffered from a brain dysfunction and some degree of brain damage, he did not agree that Evans' brain dysfunction led him to behave in any particular way. He testified that Evans' brain dysfunction was "probably overshadowed by personality characteristics and the effect of alcohol."[16] Dr. McClaren agreed with Dr. Carpenter and Dr. Dee that alcohol was a significant factor in Evans' behavior at the time of the shooting, although he could not be certain how much alcohol Evans consumed *9 before shooting Johnson. He testified that Evans reported not drinking alcohol during the car ride and that Evans indicated that he was under control and knew what he was doing at the time of the shooting. Dr. McClaren testified that Evans spoke clearly and logically in his presence and did not stutter while relaying this information. In spite of Evans' alcohol use, Dr. McClaren believed that Evans' actions during the car ride and after the shooting indicated that Evans was in control of the situation and was making the decisions in the car. Accordingly, Dr. McClaren believed that Evans understood the criminality of his conduct and did not suffer from extreme mental or emotional disturbance at the time of the murder.
Defense counsel, Kenneth Studstill, also testified at the evidentiary hearing. He testified that he was not aware of Evans' head injury but that he would have explored it along with any serious brain damage had he been aware of it. Studstill did not explore Evans' mental health because his conversations with Evans gave him no reason to believe that Evans was insane or incompetent.[17] Moreover, Studstill testified that the presentence investigation reports (PSI) from Evans' prior convictions indicated that his mental health was perfect and that he had only seen a mental heath expert when he was young. Studstill did not obtain Evans' medical records.
Studstill testified that he pursued the accidental shooting defense during the guilt phase because Evans insisted upon it. Studstill was aware Evans had been drinking prior to the murder; however, Evans told Studstill that he was not drunk and "knew what he was doing at the time." He had no reason to doubt Evans' veracity and planned to use the conflicting accounts of other witnesses to create confusion about the facts, thereby creating a reasonable doubt as to Evans' guilt.[18] He also pursued the accident defense because it was supported by Evans' statements, and, based on Evans' statements, there was no evidence supporting a heat of passion defense. Studstill further testified that Evans insisted that he was in control and focused. Finally, he testified that Evans never said anything about experiencing a seizure or a blackout.
Regarding the penalty phase, Studstill started preparing more than five months prior to trial. He met with Lily, who told him that Evans had been an obedient child and had received good grades in school. Based on this interview, Studstill asked Lily to provide him the names of potential character witnesses whom he contacted by letter;[19] and he adopted the strategy of showing Evans' redeeming qualities, such as how Evans spent time with his children and devoted time to his grandmother, at the penalty phase. He chose this strategy because he was aware that Evans' criminal *10 record indicated a propensity for violence, and he did not want to open the door to the State introducing evidence of Evans' acts of violence during his teenage years. In addition, Studstill did not recall having any evidence to support statutory mitigation, and he did not consider that Evans may have been under an extreme emotional disturbance or may not have been able to appreciate the criminality of his conduct at the time of the murder. Studstill did not obtain Evans' school records, nor did he interview other family members. He was not aware Evans had problems in school.
Studstill also testified that nearly three months before trial, he told the trial court that he did not anticipate needing a break between the guilt and penalty phases and did not plan to call any experts for a penalty phase proceeding. Studstill testified that he did not hire an investigator after the guilt phase and that he might have presented evidence of Evans' violent behavior in school at the Spencer[20] hearing had he known of it.
Regarding his legal experience, Studstill testified that he had practiced law for thirty-eight years, was a board-certified civil trial attorney, and that he began his career as a prosecutor, serving in that capacity for two years. He also testified that he had practiced criminal law over the span of his career and had taken twelve to thirteen death penalty cases to verdict. Studstill was conflict counsel in Brevard County at the time he represented Evans.

B. Standard of Review and Applicable Law
We review claims of ineffective assistance of counsel under the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We defer to the trial court's findings of fact regarding the credibility of witnesses and the weight assigned to the evidence but review the deficiency and prejudice prongs de novo. Windom v. State, 886 So.2d 915, 921 (Fla.2004) (citing Stephens v. State, 748 So.2d 1028, 1034 (Fla.1999)). "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. To establish deficient performance, a petitioner must demonstrate that counsel's representation `fell below an objective standard of reasonableness.'" Wiggins v. Smith, 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citation omitted) (quoting Strickland, 466 U.S. at 688, 104 S.Ct. 2052); see also Hodges v. State, 885 So.2d 338, 345-46 (Fla.2004) (stating and applying Strickland standard). The prejudice prong of the analysis "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Failure to establish either prong results in a denial of the claim. Ferrell v. State, 918 So.2d 163, 170 (Fla. 2005) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689, 104 S.Ct. 2052.

C. Analysis

1. Failure to Present Diminished Capacity Defense at Guilt Phase
Evans first alleges that trial counsel was ineffective for failing to investigate, *11 prepare, and present the defense of diminished capacity at the guilt phase. Based on the mental health experts' testimony at the evidentiary hearing, Evans argues that trial counsel was ineffective for failing to present evidence that Evans' head injury led to a deficiency in impulse control, which, in turn, led to Evans' "clicking" or being unable to control his rage and violent behavior. He claims that this deficiency in impulse control is evident throughout his childhood. Evans claims that at the time he shot Johnson, his condition was further exacerbated by his alcohol use, thereby diminishing his capacity to the point that he was unable to form the intent to kill Johnson.
Evans' claim is without merit. The trial court correctly held that defense counsel is not ineffective for failing to present the defense of diminished capacity because diminished capacity is not a viable defense in Florida. See Chestnut v. State, 538 So.2d 820, 820 (Fla.1989) (holding that diminished capacity is not a viable defense); see also Hodges v. State, 885 So.2d 338, 352 n. 8 (Fla.2004) ("This Court has held on numerous occasions that evidence of an abnormal mental condition not constituting legal insanity is inadmissible to negate specific intent."); Spencer v. State, 842 So.2d 52, 63 (Fla.2003) (holding that evidence of defendant's disassociative state would not have been admissible during the guilt phase). While we have made exceptions for conditions which are "commonly understood" and may be explained to the jury without the assistance of a mental health expert, such as medication, epilepsy, infancy, and senility, Bunney v. State, 603 So.2d 1270, 1273 (Fla.1992),[21] Evans has not alleged that he was experiencing such a condition at the time he shot Johnson. Counsel cannot be ineffective for failing to seek to introduce evidence of a meritless defense at the guilt phase. Jones v. State, 928 So.2d 1178, 1182-83 (Fla.2006) (citing Teffeteller v. Dugger, 734 So.2d 1009, 1023 (Fla.1999) for proposition that "[t]rial counsel cannot be deemed ineffective for failing to raise meritless claims"). Therefore, we deny this claim.
Moreover, as the trial court found, even if the diminished capacity defense were viable, Evans cannot establish that counsel was ineffective for failing to raise it because it would have been inconsistent with Evans' theory that the shooting was an accident. Evans insisted at the time of the shooting that he was focused and had a clear recollection of all that had occurred. "[C]ounsel [cannot] be deemed ineffective for failing to pursue such defense when the defense would have been inconsistent with [the defendant's] theory of the case. . . ." Dufour v. State, 905 So.2d 42, 52 (Fla. 2005) (holding that trial counsel was not ineffective for failing to put on defense of voluntary intoxication, in part because defense would have been inconsistent with defense's theory of innocence) (citing State v. Williams, 797 So.2d 1235 (Fla.2001)). We affirm the trial court's denial of this claim.

2. Failure to Challenge State's Case at Penalty Phase

(a) Failure to Request Appointment of Co-Counsel
Evans next alleges that trial counsel was deficient for failing to request the *12 appointment of co-counsel to assist in investigating and presenting mitigation in a capital case pursuant to Guideline 2.1 of the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (1989) (ABA Guidelines).[22] In denying this claim, the trial court determined that Evans failed to establish both prongs under Strickland. We agree.
First, the trial court found that Evans failed to establish that defense counsel's performance was deficient. The trial court recognized that defense counsel was bound by Brevard County's guidelines for trying a capital case, not the ABA guidelines,[23] and that Florida Rule of Criminal Procedure 3.112, which adopted the ABA guidelines in part and provides that a judge may appoint co-counsel in a capital case, had not been enacted at the time of Evans' trial. Second, even if counsel was deficient, the trial court determined that Evans had not demonstrated how counsel's solo representation prejudiced Evans. As the trial court correctly stated, "[t]he mere fact that a Defendant has been represented by one attorney alone is insufficient to establish a claim of ineffective assistance of counsel." See Cole v. State, 841 So.2d 409, 428 (Fla.2003) ("The general allegation that mitigating evidence could have been better presented [had co-counsel been requested and appointed] is an insufficient allegation of prejudice."); State v. Riechmann, 777 So.2d 342, 359 (Fla.2000) (denying claim of ineffective assistance for failure to request co-counsel where defendant failed to specifically demonstrate how counsel's solo representation affected outcome of trial). The trial court's findings are supported by competent substantial evidence. We affirm.

(b) Failure to Investigate Mental Health Mitigation
Evans next claims that trial counsel was ineffective for failing to adequately investigate his background for mental health mitigation to present at the penalty phase. Evans claims that defense counsel was deficient for failing to discover a wealth of mitigating information, including Evans' brain injury and lifelong emotional and behavioral problems, and for failing to present anything other than positive character evidence at the penalty phase. Evans alleges that he was prejudiced by counsel's deficient investigation because discovery and presentation of his brain injury and impulse disorder would have led to an instruction on both mental health statutory mitigators.
We decline to address whether counsel's investigation was deficient because we affirm the trial court's conclusion that Evans has failed to demonstrate that he was prejudiced by counsel's failure to present the mitigation evidence presented at the evidentiary hearing. "[B]ecause the Strickland standard requires establishment of both [deficient performance and prejudice] prongs, when a defendant fails to make a showing as to one prong, it is not necessary to delve into whether he has made a showing as to the other prong." Whitfield v. State, 923 So.2d 375, 384 (Fla. 2005) (alteration in original) (quoting Stewart v. State, 801 So.2d 59, 65 (Fla.2001)); see also Sweet v. State, 810 So.2d 854, 863-64 (Fla.2002) (declining to reach deficiency *13 prong based on finding that there was no prejudice).
Evans has failed to establish prejudice because the mitigation evidence he presented at the evidentiary hearing would likely have been more harmful than helpful. "An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword." Reed v. State, 875 So.2d 415, 437 (Fla.2004). While the testimony presented at the evidentiary hearing established that Evans suffered from mental health problems, it also displayed a long history of behavioral problems and escalating violence throughout his school career. Presenting this evidence at the penalty phase would have resulted in the jury hearing about Evans' aggression towards students and teachers, his aggression towards police officers, his pride in being known as a "jack-boy" because he robs drug dealers, and his habit of carrying a gun. It is just as likely that this evidence would have been more "aggravating" than mitigating. See Reed, 875 So.2d at 436-37 (denying ineffective assistance claim because "even if [defense] counsel had . . . investigated further, the testimony that could have been presented was just as likely to have resulted in aggravation against rather than mitigation for [the defendant]").
Moreover, this mitigation evidence presented at the evidentiary hearing is inconsistent with Evans' own testimony at the guilt phase. The evidence presented at the evidentiary hearing regarding Evans' uncontrollable rage disorder is inconsistent with his testimony that he had a "clear recollection" of the shooting because he was focused and in control.
Based on the foregoing, Evans has not established that there is a reasonable probability that his sentence would have been different had counsel discovered and presented the mitigation evidence Evans presented at the evidentiary hearing. See Strickland, 466 U.S. at 694, 104 S.Ct. 2052 (establishing that appropriate test for prejudice is whether defendant has demonstrated reasonable probability that outcome would have been different but for counsel's unprofessional errors and defining reasonable probability as "probability sufficient to undermine confidence in the outcome"). Therefore, we are confident in the outcome and affirm the trial court's denial of this claim.

3. Failure to Request Jury Instructions on Mental Health Statutory Mitigators
Finally, Evans alleges that counsel was ineffective for failing to request jury instructions on the mental health statutory mitigators based on evidence at trial that Evans was drinking prior to shooting Johnson and was slightly intoxicated at the time of the shooting. In particular, Evans points to three places in his trial testimony where he admits he was drinking prior to the shooting and to Sammy Hogan's testimony that he and Evans had been drinking together earlier that day. Evans argues that this evidence was sufficient to justify a jury instruction on the mental health statutory mitigators and that counsel was deficient for failing to make this request. Evans argues that he was prejudiced because had counsel requested these instructions, the jury would have been instructed on the mental health statutory mitigators, creating a reasonable probability that the jury would not have recommended the death sentence.
The trial court found that counsel was not ineffective for failing to request the mental health statutory mitigators on the basis that Evans was "slightly" intoxicated at the time of the shooting. The trial court held that counsel could not be deemed deficient for "failing to present a *14 mitigator that was not supported by the record or would have been inconsistent with the evidence and testimony presented by the defendant." Cherry v. State, 781 So.2d 1040, 1050 (Fla.2000). Specifically, the trial court found that evidence of Evans' intoxication was refuted by Evans' trial testimony that while he was slightly intoxicated he was not drunk and had a clear recollection of what happened. Furthermore, the trial court found that these mitigators were inconsistent with the defense's theory that the shooting was an accident. Thus, the trial court found that counsel was reasonable for not requesting instructions on the mental health statutory mitigators. The trial court also found that Evans had not demonstrated how counsel's failure to request these instructions prejudiced him.
The trial court's findings regarding the deficiency prong are supported by the record. As the trial court noted, Evans' trial testimony clearly refuted his current argument that he was impaired at the time of the shooting. Evans insisted that the shooting was an accident and that, in spite of having consumed some alcohol, he was focused and had a clear recollection of everything that was happening. In light of these circumstances, we agree with the trial court that counsel's decision not to request instructions on statutory mitigation for lack of grounds was reasonable. See Strickland, 466 U.S. at 691, 104 S.Ct. 2052 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); see also Brown v. State, 894 So.2d 137, 146 (Fla.2004) (same). Thus, counsel cannot be deemed deficient for failing to request an instruction on a mitigator that "would have been inconsistent with the evidence and testimony presented by the defendant." Cherry, 781 So.2d at 1050.[24]
In addition, Evans has not demonstrated that he was prejudiced by counsel's failure to request these instructions because he has not shown that the sentencing court would have given the instructions on statutory mitigation to the jury. In Cooper v. State, 492 So.2d 1059, 1062 (Fla. 1986), we held that the trial court did not err by refusing to instruct the jury on statutory mitigation because "the presentation of evidence of some alcohol and marijuana consumption, without more, does not require a jury instruction." See also Duest v. State, 855 So.2d 33, 42 (Fla. 2003) (citing Cooper for this proposition). We have recognized that "evidence of [the defendant's] probable mental state at the time of the murder, [or] evidence of a pervasive mental condition that affected [the defendant] every day" is required. Duest, 855 So.2d at 42 (holding that trial court did not err in refusing to give statutory mitigation instructions because, although there was evidence of defendant's "long-term drug abuse and consumption of intoxicants . . . in the hours preceding the crime" there was "no evidence indicating that [defendant] was substantially impaired at the time of the murder or that his ability to control his behavior was reduced by drug or alcohol abuse") (citing Cooper, 492 So.2d at 1062).
Based on the record, Evans has not shown that the sentencing court would have given these instructions had counsel requested them. At the guilt phase, there was no evidence presented that Evans suffered a pervasive mental condition or that *15 he was under the influence of alcohol to the extent that he could not control his actions. The only evidence of Evans' "probable mental state" at the time of the murder was his trial testimony and, as in Duest, this testimony does not support an instruction on the mental health statutory mitigators.
Furthermore, we recognize that the sentencing court considered the mental health statutory mitigators and found no evidence to support them. We find that Evans has not demonstrated that there is a reasonable probability that his sentence would have been different had counsel requested instructions on statutory mitigation based on Evans' use of alcohol prior to the shooting. We are confident in the outcome and therefore affirm the trial court's denial of this claim.

III. PETITION FOR WRIT OF HABEAS CORPUS
Having affirmed the trial court's denial of Evans' 3.851 motion, we now consider Evans' petition for writ of habeas corpus. In his petition, Evans raises six claims. We limit our discussion to two of these claims and deny relief for the reasons stated below.[25]

Ring Claim
Evans argues that Florida's death penalty statute, section 921.141, Florida Statutes (2002), as applied to him is unconstitutional pursuant to Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2428, 147 L.Ed.2d 435 (2000), and Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Notwithstanding that Evans' direct appeal was in the "pipeline" when Ring was decided in 2002, this claim is procedurally barred because Evans did not preserve this claim by challenging the constitutionality of Florida's sentencing scheme both at trial and on direct appeal.[26] Notwithstanding this procedural bar, Evans would not be entitled to relief under Ring because the trial court found the prior violent felony conviction aggravator *16 applied in his case. "[T]his Court had repeatedly relied on the presence of the prior violent felony aggravating circumstance in rejecting Ring claims." Morris v. State, 931 So.2d 821, 837 (Fla.2003). A defendant's prior violent felony conviction is "`a factor which under Apprendi and Ring need not be found by the jury,'" Dufour, 905 So.2d at 75 (quoting Jones v. State, 855 So.2d 611, 619 (Fla.2003)). Thus, even if Evans' claim were properly preserved, he would not be entitled to relief under Ring.

Cumulative Error
Evans claims he was deprived of a fundamentally fair trial because the cumulative errors in his trial dictated the sentence he received. This claim is without merit. Because Evans has failed to prevail on the merits of any of his individual claims on direct appeal, in this appeal, or in his petition for habeas corpus, we deny his claim that he was deprived of a fundamentally fair trial on the basis of cumulative error. See Morris, 931 So.2d at 837 (denying claim based on cumulative error where the individual claims making up the cumulative claim were either procedurally barred or without merit); Dufour, 905 So.2d at 75 (finding that claims failed cumulatively where individual claims presented in habeas petition and in motion for postconviction relief provided no basis for relief) (citing Porter v. Crosby, 840 So.2d 981 (Fla.2003)).

IV. CONCLUSION
For the reasons set forth above, we affirm the trial court's denial of Evans' motion for postconviction relief, and we deny his petition for a writ of habeas corpus.
It is so ordered.
LEWIS, C.J., and WELLS, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which ANSTEAD, J., concurs.
PARIENTE, J., specially concurring.
I concur in the decision in this case and in the majority's discussion of each of Evans' claims, with the exception of its disposition of the claim that the death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Rather than base our denial on a waiver or procedural bar, I would reject the claim solely on the basis of the prior violent felony aggravator. As the majority acknowledges, this death-qualifying aggravator found by the trial court satisfies the requirements of the Sixth Amendment. See Jones v. State, 855 So.2d 611, 619 (Fla.2003) (noting that prior violent felony conviction aggravator was "a factor which under Apprendi and Ring need not be found by the jury"); Doorbal v. State, 837 So.2d 940, 963 (Fla.2003) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony).
This is a "pipeline case"one that was pending on direct appeal when Ring was decided. Since the Ring claim is without merit, we should not reach the issue of whether the Ring claim was waived when it was not raised on direct appeal. We have already decided that Ring is not retroactive. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005). We should wait for a case in which the Ring claim would otherwise have merit before delving into the implications of the failure to preserve a Ring claim on direct appeal in pipeline cases.
ANSTEAD, J., concurs.
NOTES
[1] This defense was based on the version of events Evans eventually relayed to police. Initially, Evans told police that he was never in Hogan's car with Johnson. Later, he recanted this statement and told police as well as defense counsel, the trial court, and the jury that he accidentally shot Johnson.
[2] The other witnesses who testified at Evans' penalty phase were: Minnie Jarrett, Evans' cousin; Linda Key, Evans' lifelong friend; and Patty Walker, Evans' friend.
[3] The nonstatutory mitigators were: (1) Evans experienced an abused or deprived childhood; (2) he contributed to society; (3) he performed charitable deeds; (4) he counseled youth to avoid crime and stay in school; and (5) he exhibited good behavior in prison. Evans, 838 So.2d at 1097.
[4] Evans raised six issues on direct appeal. He claimed that the trial court erred during the guilt phase by (1) permitting the introduction of hearsay testimony on the grounds that the statements constituted excited utterances; (2) denying his motion for a mistrial based on comments made by the prosecutor during closing argument; (3) denying his motion for judgment of acquittal as to the murder charge because the State did not sufficiently establish premeditation; and (4) improperly instructing the jury on kidnapping. He claimed that the trial court erred during the penalty phase by (5) permitting the State to introduce portions of his presentence investigation reports (PSI) from prior convictions. Finally, he claimed that (6) the death sentence was disproportionate. Id. at 1093-99.
[5] In his motion for postconviction relief, Evans claimed that counsel was ineffective (1) at the guilt and penalty phases for failing to impeach the State's witnesses, Sammy Hogan and Erica Foster; (2) at the guilt phase for failing to investigate, prepare, and present the defense of diminished capacity; (3) at the penalty phase for failing to adequately challenge the State's case; and (4) at the penalty phase by failing to request that a jury instruction be given on statutory mitigation.

In addition, Evans raised six other claims in his rule 3.851 motion for the express purpose of preserving them for federal review. Evans alleged that (5) the Florida death sentencing statute is unconstitutional as applied; (6) section 921.141, Florida Statutes, providing that the jury's role is advisory, violates the Eighth Amendment; (7) his Eighth Amendment right against cruel and unusual punishment will be violated because he may be incompetent at the time of execution; (8) the cumulative errors in his trial unconstitutionally deprived him of a fair trial; (9) the jury instructions improperly shifted to him the burden of proving that death was inappropriate; and (10) execution by lethal injection constitutes cruel and unusual punishment in violation of his constitutional right to due process and equal protection under the law. In addition, for claims (6), (7), and (9), Evans claimed that appellate counsel was ineffective for failing to litigate these issues.
[6] Evans appeals only the trial court's denial of claims 2, 3, and 4. Evans does not appeal the trial court's denial of his last six claims, but, instead, raises these claims in his petition for writ of habeas corpus.
[7] We do not address Evans' claims that counsel was ineffective for failing to present evidence to support the two statutory mental health mitigators because these issues are solely dependent upon our resolution of whether counsel failed to conduct an adequate investigation into Evans' mental health (claim 2(b)).
[8] Within this claim, Evans also attempts to raise an issue under Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). This issue is procedurally barred because it was not raised on direct appeal. See Marshall v. State, 854 So.2d 1235, 1248 (Fla. 2003).
[9] Evans' injury is noted in his school records because Evans' mother relayed the incident to a school social worker during one of Evans' evaluations.
[10] As an adult offender, Evans has two prior felony convictions for battery upon a law enforcement officer and one prior conviction for aggravated battery.
[11] These convictions were for possession of a firearm and escape.
[12] In preparing their reports, each expert interviewed Evans, reviewed Evans' medical and school records, reviewed the transcripts from the trial, reviewed the interviews of the witnesses called at trial, and ran a battery of tests.
[13] Specifically, Dr. Carpenter's "clinical impression" or diagnosis of Evans was in accordance with Axis I of the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM IV) test: "Axis I: Alcohol abuse; Impulse Disorder; Rage Reaction Secondary to Closed Head Injury."
[14] Specifically, Dr. Dee's report provided the following "summary impression" of Evans:

Looking at the lifelong history that Mr. Evans has, with learning disabilities, a lack of behavioral and impulse control, which included frequent rages, often when they were frankly inexplicable to others, attentional problems, over activity, etc., would strongly seem to support the diagnosis of cerebral damage early in childhood, probably resulting from the accident [at] age 3.
[15] Although Evans did not tell Dr. Dee the shooting was an accident, Dr. Dee testified that "[i]t seems he shot her without question, and he was very angry at the time."
[16] Specifically, Dr. McClaren diagnosed Evans as a "non-psychotic man operating within the average range of intellect." He also stated:

There certainly is evidence that he sustained a closed head injury as a young child and subsequently had difficulties with his behavior and learning in school which progressed to juvenile delinquency and adult criminality. While some minor degree of brain dysfunction is certainly a possibility given his history of head injury and emotional and behavioral problems as a child prior to the onset of criminality[,] his behavior later in life appears to be more associated with a criminal lifestyle than with the effects of some disabling cognitive disorder of such a severity to cause impairments which would be a significant difficulty for him.
Regarding the DSM-IV test, Dr. McClaren reported that Evans "appears to meet . . . AXIS I criteria for Alcohol Abuse in Remission in a Controlled Environment and AXIS II diagnosis of Antisocial Personality Disorder." Dr. McClaren further noted that Evans "probably meets the AXIS II diagnosis of Personality Disorder, Not Otherwise Specified with Narcissistic and Paranoid Traits." Dr. McClaren also reported that he could not rule out the "possibility" that Evans "suffers from a Cognitive Disorder, Not Otherwise Specified, associated with the after affects of a childhood concussion and other blows to the head . . . given his documented history of head injury as a child, as well as . . . fights, football, and boxing."
[17] Studstill testified that in previous cases, he had been successful in having clients examined and committed but stated, "I didn't have any reason in the world to think there was anything wrong with Wydell Evans' mind in the sense that it would be a mitigating factor of any kind, and certainly not a defense in the guilt or innocence phase of the trial."
[18] Studstill testified that he conducted a thorough investigation into Evans' guilt phase defense. He hired a private investigator, a former homicide detective, to interview the State's witnesses prior to trial. Primarily, he was looking for further inconsistent statements among the witnesses, in particular, between Odenat, Foster, and Hogan, because their accounts of Johnson's death were not entirely consistent with one another.
[19] In the letters, Studstill asked the potential character witnesses to state (1) how long they had known Evans, (2) in what capacity, and (3) what they thought of Evans as a person and whether they felt that he committed the homicide.
[20] Spencer v. State, 615 So.2d 688 (Fla.1993).
[21] We note that while Bunney also includes intoxication as one of the "commonly understood" conditions, voluntary intoxication due to alcohol is no longer admissible to negate specific intent during the guilt phase. § 775.051, Fla. Stat. (1999). In addition, Evans' trial testimony regarding his use of alcohol does not support a voluntary intoxication defense, nor has Evans alleged that his counsel was ineffective for failing to raise a voluntary intoxication defense during the guilt phase.
[22] Guideline 2.1 states that "[i]n cases where the death penalty is sought, two qualified trial attorneys should be assigned to represent the defendant."
[23] Studstill testified that he had followed Brevard County's standards for handling capital cases, not the ABA's. He also testified that it is not his practice to request co-counsel, and he did not move to have penalty phase co-counsel appointed in Evans' trial.
[24] We note that we distinguished Cherry in Ragsdale v. State, 798 So.2d 713, 719 (Fla. 2001), on the distinct issue of whether counsel was ineffective for failing to investigate and present mitigation evidence and stated: "In contrast to Cherry, we find no evidence that Ragsdale was uncooperative or that he precluded his counsel from investigating and presenting evidence in mitigation."
[25] In addition to the claims discussed above, Evans alleges the following claims (renumbered and restated from note 5, supra): (1) the jury was unconstitutionally instructed that its role was merely "advisory" and that this diminution of the jury's role violated the Eighth Amendment under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (2) his constitutional rights may be violated because he may not be competent to be executed; (3) the jury instructions violated his constitutional rights by improperly shifting the burden of proof to him to show that death was inappropriate; and (4) execution by lethal injection constitutes cruel and unusual punishment in violation of his constitutional rights. Evans concedes that claim (2) is not yet ripe for review. Because claims (1), (3), and (4) are procedurally barred, Evans also alleges that appellate counsel was ineffective for failing to litigate these issues on direct appeal. However, because claims (1) and (4) are meritless and claim (3) was not preserved for direct appeal, "[a]ppellate counsel cannot be ineffective for failing to present [these] meritless issue[s]" Dufour, 905 So.2d at 74.
[26] See Floyd v. State, 808 So.2d 175, 187 (Fla.2002) (finding that a claim of constitutional error under Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), was not preserved for post-conviction review because it was not raised both at trial and on direct appeal); Downs v. State, 740 So.2d 506, 517 (Fla.1999) (finding that claim of Espinosa error was procedurally barred on post-conviction review where not raised at both trial and on direct appeal although Espinosa decided while direct appeal in pipeline); Espinosa v. State, 626 So.2d 165, 167 (Fla. 1993) (on remand) (holding in part that even if constitutional claim were not procedurally barred, constitutional error did not require reversal); Washington v. Recuenco, ___ U.S. ___, ___-___, 126 S.Ct. 2546, 2551-52, 165 L.Ed.2d 466 (2006) (clarifying that a constitutional error is not necessarily a structural error requiring reversal and citing Ring as example).