DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**MICHAEL PERRY,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D17-3064

[September 26, 2018]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, St. Lucie County; James W. McCann, Judge; L.T. Case No. 2014-CF-000732-A.

Carey Haughwout, Public Defender, and Marcy Karr Allen, Special Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Rachael Kaiman, Assistant Attorney General, West Palm Beach, for appellee.

GROSS, J.

Michael Lee Perry was convicted of seven felonies, all arising from a crime spree, for which he received various sentences, including life in prison. We write to address two issues—the giving of Florida Standard Jury Instruction (Criminal) 3.6(p) and the State's bolstering of an important witness. We hold that giving instruction 3.6(p) under the facts of this case and the State's bolstering of a police officer's testimony require a new trial.

### *The Defendant's History of Mental Illness*

Because standard instruction 3.6(p) deals with "Abnormal Mental Conditions," we first focus on the defendant's history of mental illness as a background for the evidence at trial. The jury heard no expert testimony about the defendant's mental condition, but the defendant's history of mental illness may have influenced the judge's decision to include instruction 3.6(p) at the end of the case.

At the age of 16, Perry was in a juvenile detention facility and was placed in protective custody. While in isolation, he started hearing voices. Perry called the voices "spirits," and he said the spirits tell him what people are thinking. He was diagnosed with schizophrenia.

In January, 2014, at the age of 20, Perry was Baker Acted. The incidents in this case occurred two months after his release.

Perry's attorney first raised his mental condition as an issue in this case by moving for an examination to determine his competency because when she met with him she "could not have even a semblance of a rational conversation with him." A doctor examined the defendant and found him competent to proceed.

Perry's mental condition was raised a second time by a different court-appointed attorney, who filed a notice of intent to rely on the defense of insanity.

The case first proceeded to trial on June 26, 2017. The insanity defense was withdrawn. Before any jury was sworn, the judge called the defendant to the stand. He testified that he was on Cogentin for depression, schizophrenia, bipolar, ADHD, "and one other I believe." He stated that he had a history of hearing voices, and that the voices were talking to him that morning. When asked what the voices were telling him, he answered "the voices aren't telling me anything. They're just telling me what's in y'all head." When the prosecutor asked what was in his head, the defendant answered, "Your mind said 'B you crazy' – like bitch, you crazy." The defendant told the court that he could not focus on the jurors because of the voices that day.

The circuit judge declared a mistrial. Defense counsel moved for an examination to determine Perry's competency to proceed, among other things. The court appointed a doctor to examine Perry. The doctor's report found him competent to proceed to trial. The court entered an order adopting that finding and the case proceeded to a jury trial.

### The Evidence at Trial

<u>1. Robbery of the carpet installer, Attempted Robbery of the landlord, and Burglary of a Dwelling with Assault and Battery (2 counts).</u>

On March 10, 2014, the landlord was inside his rental home doing minor repairs while supervising the installation of new carpet.

The carpet installer was sweeping a bedroom in the home when he was pushed from behind. He testified that he "felt a hand behind my back just push me against the wall." He thought it was a co-worker playing a joke until he realized his wallet had been removed from his back pocket. The carpet installer snatched his wallet out of the thief's hand, and the thief ran from the room.

The landlord saw the thief coming out of the bedroom where the carpet installer was working. The thief patted the landlord down "mainly around my waist to try to get my wallet I assume." The landlord pushed him away and the thief grabbed a broom and hit the landlord once on the back. The thief ran out, got on his bike and was "gone in a flash."

Later that day, the landlord and the carpet installer were shown photo arrays. The carpet installer was not able to identify the thief, but the landlord selected Perry's photograph. The landlord testified that he was 100 percent sure it was Perry who tried to rob him.

## 2. Robbery of the home health aide.

A couple of blocks away from the landlord's home, a home health aide (the "HHA") arrived at a client's house. As he knocked on his client's door, he was approached by a man who asked for change. The HHA told him that he did not have any change. The man's demeanor and facial expression changed. He said: "you know, I need some cash," and the HHA told him he did not have any to spare.

The man noticed the HHA's wallet attached to a chain. He said: "Well, I'll just take your f'ing wallet." The man punched the HHA in the face, and he fell to the ground. The man kicked and punched the HHA and ripped his wallet off of the chain which was attached to his pants. The thief left on a bicycle, turned back and smiled at the HHA, and gave him the middle finger.

The HHA called 911 and Officer Jacob Blaszyk arrived in 1-2 minutes. The HHA told the officer which way the thief was traveling and described him as a black male, 5'9", weighing 170 pounds. He described his clothing as a green Dickies outfit with matching pants and a green hat.

The HHA was later driven to a show-up identification. He testified that he was able to identify the suspect at the show-up, even though he was not wearing the hat. At trial, the HHA testified that he was 100 percent sure that Perry was the man who robbed him.

### 3. The BOLO and Resisting Arrest Without Violence.

Officer Blaszyk radioed in a BOLO for a black male, approximately 5'8" wearing a green mechanic's outfit with matching pants and a white hat. A police sergeant saw a man matching the BOLO walking across a street toward a convenience store northwest of where the HHA was attacked.

The sergeant drove his marked car into a space behind the store so the car was concealed from the suspect as he approached. He waited around the corner, and when the suspect got close, he stepped out from behind the shop.

The sergeant described the stop: "I put my hand out and I says, hey, can I speak to you for a second?" The suspect stopped and "within a second, he just turned around and took off running." The sergeant pursued on foot and "ordered [the suspect] a couple of times to stop—"

### 4. Burglary of a Conveyance with Assault and Battery, Resisting with Violence, and Battery on a Law Enforcement Officer.

Perry was found hiding in the back of an SUV. The owner of the SUV testified that he did not give Perry permission to enter his vehicle.

After locating Perry, the sergeant and Officer Blaszyk opened the rear doors of the SUV. Officer Blaszyk gave an oral command for Perry to come out.

Officer Blaszyk said he acted quickly before Perry could come up with a plan; he jumped into the SUV and tried to pull Perry out, at which point the suspect started, "to actively resist by throwing punches and kicks." Another officer testified that Perry was actively and physically resisting and that Perry and Officer Blaszyk "just started going at it with each other . . . in that close quarter . . . compartment."

Officer Blaszyk testified that Perry started punching and kicking the minute he grabbed him. He stated: "One of his punches hit me in the eye. Just a flailing punch." Officer Blaszyk later testified that even though the punch was "just part of his flailing about," Perry intended to strike him "because he was striking me in the face."

As a result of the altercation, Perry sustained injuries to his face. Photographs placed in evidence showed Perry's beaten face which was scratched, bruised, and swollen.

## 5. Perry's statements

After Perry was arrested, Officer Blaszyk took him to the hospital. Officer Blaszyk testified that he read Perry his *Miranda*[1] rights and then began to question him about robbing the HHA. Officer Blaszyk did not record the interaction. According to the officer, Perry "kinda told me that he was going through rough times in his life and that . . . the guy on 22nd was in the wrong place at the wrong time, uh, he did what he had to do and he decided to punch him and take his wallet and that's what he did." The officer testified that Perry told him that he threw the wallet into a dumpster.

After he was released from the hospital, the police transported Perry to the police station. There, another officer took a second statement, which was recorded. The State played the DVD for the jury.

Perry's affect during the recorded interview does not present as someone with a serious mental condition. He leans forward, fails to make eye contact, sways, rambles, mumbles, gives inconsistent and contradictory responses, and repeats the phrase "yuh feh meh"[2] at random.

During the recorded statement, Perry says he "ain't do nothing, man." When asked why he told Officer Blaszyk where he threw the wallet out, he says he was just telling him what he wanted to hear, "so he don't beat me." When asked why he ran, he said, "I don't know man I just lost it, I went psych."

He said he was having a "bad day" and throwing a "temper tantrum." He offered to plead no contest and said he will be straight. He reiterated: "I'm straight . . . I mean I'm good . . . I just ran from y'all you know what I'm sayin', cause I psyched out – spazzed out, yuh feh meh?"

## 6. Perry's defense at trial and convictions

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] We interpret this to be the expression, "Do you feel me?", a slang phrase "used to see if someone understands what you are talking about." https://www.urbandictionary.com/define.php?term=Feel%20Me (last visited Aug. 27, 2018); *see generally* https://www.quora.com/What-does-the-phrase-Do-you-feel-me-mean (last visited Aug. 22, 2018) ("Sometimes the person asking the question wants to know if the people [he's] talking to can sympathize or empathize with what [he] is saying, that is [he] is asking *do you feel the same way I feel about this*.").

Perry's defense to the robberies was misidentification. His defense to the resisting without violence charge was that the sergeant did not have grounds to stop him. His defense to the battery on a law enforcement officer charge was that he struck the officer without intent while he was being beaten and flailing. His response to the "rough times confession" was that Officer Blaszyk could not be believed because he did not tape the first interview.

The jury found that Perry was guilty on all counts. He was adjudicated and sentenced for: (1) burglary of a dwelling with assault or battery (two counts); (2) robbery of the carpet installer; (3) attempted robbery of the landlord; (4) robbery of the HHA; (5) resisting officer without violence; (6) burglary of a conveyance with assault or battery; (7) resisting officer with violence; and (8) battery on a law enforcement officer.[3]

### Giving The Abnormal Mental Condition Instruction Was Error

Over objection, the trial judge gave Criminal Standard Jury Instruction 3.6(p), which reads:

> Mental illness, an abnormal mental condition, or diminished mental capacity is not a defense to any crime in this case. Any such evidence may not be taken into consideration to show that the defendant lacked the specific intent or did not have the state of mind essential to proving that [he][she] committed the crime[s] charged [or any lesser crime].

Perry argues that the instruction was erroneously given in this case because it was unsupported by the evidence and served only to mislead the jury. Perry argues that "absent an evidentiary basis, the instruction plays upon the stigma, fear and prejudice associated with the mentally ill."

We hold that it was error to have used the instruction under the facts of this case. When given, instruction 3.6(p) should be anchored to evidence in the case. Absent such evidence here, the instruction morphed into the judge's comment on the defendant and his recorded statement that interfered with the jury's determination of specific intent based on its evaluation of all the evidence in the case.

---

[3] The State concedes that Perry's dual convictions for burglary of a dwelling constitute double jeopardy because they are based on a single entry. *Gorham v. State*, 968 So. 2d 717, 718-19 (Fla. 4th DCA 2007). On remand, Counts 5 and 9 should be dismissed.

Our standard of review is abuse of discretion. *Krause v. State*, 98 So. 3d 71, 73 (Fla. 4th DCA 2012). "Under the abuse of discretion standard of review, the party defending the jury instructions on appeal must show that the requested instruction accurately stated the applicable law, the facts supported giving the instruction, and the instruction was necessary in order to allow the jury to properly resolve all the issues in the case." *Stokes v. Wynn*, 219 So. 3d 891, 894 (Fla. 4th DCA 2017). Here, the facts did not support giving the instruction.

Instruction 3.6(p) was added to the standard criminal instructions in 2017. *In re Standard Jury Instructions in Criminal Cases-Report 2016-01*, 213 So. 3d 680, 685 (2017).[4] The Comment to Instruction 3.6(p) provides scant guidance. It begins: "This instruction should be given only where it is applicable and appropriate under the facts of the case." This is little help; we doubt Florida judges are in the habit of reading jury instructions that are not applicable and appropriate under the facts of the case. The Comment continues:

> "[D]iminished capacity is not a viable defense in Florida." *Evans v. State*, 946 So. 2d 1,11 (Fla. 2006); *Lukehart v. State*, 70 So. 3d 503, 515 (Fla. 2011). Evidence of an abnormal mental condition not constituting legal insanity is inadmissible "for the purpose of proving either that the accused could not or did not entertain the specific intent or state of mind essential to proof of the offense in order to determine whether the crime charged, or a lesser degree thereof, was in fact committed." *Chestnut v. State*, 538 So. 2d 820 (Fla. 1989). In some cases, however, such evidence, or something that jurors might interpret as such evidence, might be admitted presumably for another purpose or might simply be obvious or apparent from the facts of the case. In such cases, it could be appropriate in the court's discretion to give this instruction to avoid the possibility of juror confusion.

Both the instruction and the Comment refer to "evidence." The three cases cited in the Comment all involved a specific type of evidence—expert testimony regarding an abnormal medical condition. *See Evans*, 946 So. 2d at 11 (discussing "mental health experts' testimony"); *Lukehart*, 70 So. 3d at 515 (involving expert testimony of a "Dr. Krop"); *Chestnut*, 538 So.

---

[4] In authorizing the instructions, the Court expressed "no opinion on their correctness and remind[ed] all interested parties that this authorization forecloses neither requesting additional or alternative instructions nor contesting the legal correctness of the instructions." *Id.* at 681.

2d at 821 (involving a proffer of "expert testimony seeking to establish" that the defendant "did not have the mental state required" for premeditated murder). The Comment also suggests that the "[e]vidence of an abnormal mental condition" might be "obvious or apparent from the facts of the case."

While the Comment does not give any scenarios where giving the instruction would be appropriate, there are situations where expert evidence of a defendant's state of mind is admissible to establish a defense other than insanity, and in such cases Instruction 3.6(p) might be proper. For example, in *Filomeno v. State*, 930 So. 2d 821, 822-23 (Fla. 5th DCA 2006), the court found that it was error to exclude a psychologist's testimony about the characteristics of the "fight or flight" response where the defendant's state-of-mind was relevant to establish "the reasonableness of the use of force in self-defense." In *State v. Mizell*, 773 So. 2d 618, 621 (Fla. 1st DCA 2000), the court found that evidence of the defendant's post-traumatic stress disorder was "relevant on the question of self-defense." In *State v. Hickson*, 630 So. 2d 172 (Fla. 1993), the supreme court found that expert testimony on battered spouse syndrome was admissible to support the defendant's self-defense claim. Finally, in *Delice v. State*, 878 So. 2d 465, 468 (Fla. 4th DCA 2004), this court held it was error to exclude the testimony of the defendant's psychiatrist because evidence of her depression was relevant to support her entrapment defense. In each of these cases, the jury could be given a limiting instruction that the expert testimony does not tend to prove lack of specific intent but rather is relevant to establish a particular defense. *Id.* at 468.

There are narrow exceptions to the general bar to testimony on mental conditions that undermine specific intent. The supreme court has observed that "evidence of voluntary intoxication and of other commonly understood conditions that are beyond one's control, such as epilepsy, are admissible in cases involving specific intent." *Spencer v. State*, 842 So. 2d 52, 63 (Fla. 2003). "Unlike the notion of partial or relative insanity, conditions such as intoxication, medication, epilepsy, infancy, or senility are, in varying degrees, susceptible to quantification or objective demonstration, and to lay understanding." *Chestnut*, 538 So. 2d at 823.

A jury's evaluation of a defendant's demeanor, recorded statement or testimony, is akin to those matters which a jury is allowed to consider in cases involving specific intent, because it is "susceptible . . . to lay understanding." *Id.* Evaluating testimony is what a jury does at trial.

We have reviewed the recorded statement. Neither the defendant's behavior nor his references to "spazzing out" or "psyching out" constituted

sufficient evidence of an abnormal mental condition to trigger the need for the instruction. Perry did not raise insanity as a defense. Unlike the defendants in *Filomeno* and *Delice*, Perry called no experts to testify about his mental condition. He did not seek to argue that his schizophrenia excused his conduct. He did not offer any "evidence" of mental illness, an abnormal mental condition, or diminished mental capacity within the meaning of the instruction or the comment.

"It could be said that many, if not most, crimes are committed by persons with mental aberrations." *Chestnut*, 538 So. 2d at 825. Juries have traditionally listened to defendants' statements or evaluated their testimony in light of all the evidence in a case to decide whether a defendant had the requisite specific intent to be found guilty of a crime.

The trouble with Instruction 3.6(p) here is that it was tantamount to a comment on the evidence, a *suggestion* that Perry suffered from "mental illness or an abnormal mental condition or diminished mental capacity." Were the jurors supposed to make the diagnosis themselves from the recorded statement? If they decided that Perry suffered from an abnormal mental condition, did the instruction mean that they had to find Perry guilty as charged? Here, the instruction crossed the line and invaded the province of the jury to decide the issue of specific intent based on the evidence, unencumbered by expert testimony, as juries have done since the dawn of the republic.

### *Admission Of Irrelevant Testimony That Perry Did Not File An Administrative Complaint Or Lawsuit*

We also conclude that the trial court erroneously admitted irrelevant evidence when it allowed Officer Blaszyk to testify that Perry had not commenced any internal affairs investigations or filed any lawsuits or complaints of police brutality against him. Specifically, the testimony that was elicited is:

Q. Now, uh, have you had any internal affairs filed against you from this Defendant?

A. No, I have not.

Q. Okay. Uh, any lawsuits or complaints of anything of police brutality or anything like that?

A. No, I have not.

Q. Okay.  I was asking you, yeah, no Internal Affairs –

A. No Internal Affairs.

Q. Complaint from him?  Any lawsuits of police brutality or –

A. No.

Q. Any allegations –

A. No.

Q. Or anything like that?

A. No.

At trial, counsel for Perry timely objected to the line of questioning.  The State argued that the testimony was relevant because counsel for Perry had elicited testimony about Perry's injuries that resulted from the scuffle with Officer Blaszyk.  Ultimately, the court found the lawsuit evidence was "marginally relevant given the potential defense."

"Relevant evidence is evidence tending to prove or disprove a material fact."  § 90.401, Fla. Stat. (2017).  "All relevant evidence is admissible, except as provided by law."  § 90.402, Fla. Stat. (2017).

Perry's failure to bring a lawsuit or file an administrative complaint was irrelevant because it did not tend to prove or disprove whether Officer Blaszyk behaved appropriately when he forcibly arrested the defendant. Officer Blaszyk's motive for testifying and possible biases and prejudices were relevant, and these were areas the defendant was entitled to explore on cross-examination.  Where a defendant has filed a complaint or lawsuit concerning an officer, such evidence is proper and relevant on cross-examination of the officer to expose biases and prejudices.  *See Lutherman v. State*, 348 So. 2d 624, 625 (Fla. 3d DCA 1977) (reversing conviction where defendant was not permitted to question two police officers about his pending police brutality complaints against them arising from the subject arrest); *see also Breedlove v. State*, 580 So. 2d 605, 608 (Fla. 1991) (evidence of internal affairs investigation was relevant to the witness's bias or prejudice).

However, while lawsuit evidence may have been relevant and therefore admissible on cross-examination, the State was not entitled to bring out the absence of any lawsuit on direct examination of the officer. The failure to pursue a civil suit or an internal affairs investigation can be due to a variety of reasons unrelated to the truth of a defendant's claim of police misconduct. Perry was not less likely to have been a victim of excessive force simply because he chose not to file a civil suit or commence an internal affairs investigation.

The erroneous admission of the testimony was magnified by the prosecutor's closing, where he essentially testified that if there had been police brutality in this case, he would have taken action:

> Let me tell you all something, police brutality exists, just not in this case. There are cases of police brutality and it's disgusting, it's criminal and it's evil. *Any police officer who wears that badge and uniform if they commit police brutality, if they use excessive force, then not only do they deserve to lose their job, but they deserve to be prosecuted to the fullest extent.* I will be the first one to tell you that, **I would demand that**. This ain't the case of police brutality.

Given the bolstering of Officer Blasyzk's testimony in closing, the error in admitting the testimony is not harmless beyond a reasonable doubt. After the closing, the jury might well have concluded that the absence of a lawsuit or internal affairs investigation meant that the officer had been cleared of any wrongdoing in the case. An examination of the entire record reveals that Officer Blasyzk was the State's key witness.

- He responded to the HHA's 911 call;

- He received the description of the suspect and then used that description when he put out the BOLO;

- He ordered Perry out of the car and decided when to use force and the level of force that was appropriate;

- He inflicted injuries to Perry's face while attempting to extract him from the car;

- He was the only witness to testify that Perry intentionally struck him in the face which may have resulted in Perry's conviction for battery on a law enforcement officer;

- He claimed to have read Perry his *Miranda* rights; and

- He claimed to have extracted an unrecorded post-*Miranda*, voluntary confession from Perry.  Based on Officer Blaszyk's *Miranda* claims, the second officer did not read Perry his *Miranda* rights before the videotaped interrogation.

For these reasons, we reverse and remand for a new trial.

CONNER and KLINGENSMITH, JJ., concur.

*     *     *

***Not final until disposition of timely filed motion for rehearing.***