# Supreme Court of Florida

_____

No. SC13-1213
_____

**TAVARES J. WRIGHT,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[March 16, 2017]
**<u>REVISED OPINION</u>**

PER CURIAM.

This case is before the Court on appeal from an order denying Tavares Jarrod Wright's initial motion to vacate his convictions and sentences under Florida Rule of Criminal Procedure 3.851, as well as Wright's renewed motion to determine intellectual disability filed pursuant to Florida Rule of Criminal Procedure 3.203. We have jurisdiction. <u>See</u> art. V, § 3(b)(1), Fla. Const.

## FACTS AND BACKGROUND

On November 13, 2004, a jury found Wright guilty of two counts of first-degree murder, two counts of kidnapping, two counts of robbery, and one count of carjacking. <u>See</u> <u>Wright v. State</u>, 19 So. 3d 277, 289 (Fla. 2009). After Wright

waived his right to a penalty phase jury, the trial court sentenced Wright to death

for each murder, as well as life imprisonment for each of his other convictions.

See id. at 289-91.

On direct appeal before this Court, we detailed the facts leading up to

Wright's convictions and sentences:

> With the aid of codefendant Samuel Pitts, Wright carjacked, kidnapped, robbed, and murdered David Green and James Felker while engaged in a three-day crime spree that spanned several areas in Central Florida. [FN2] During the crime spree, Wright was connected multiple times to a stolen pistol that matched the caliber of casings discovered at the scene of the murders. The trial court allowed the State to present evidence of these collateral acts to demonstrate the context in which the murders occurred and to explain Wright's possession of the murder weapon.
>
> > [FN2] Wright and Pitts were tried separately for the murders. Pitts was convicted of two counts of first-degree murder and other offenses related to this incident. He received sentences of life imprisonment for the murders.
>
> The spree began when Wright stole a pistol and a shotgun from the Shank family's residence in Lakeland on Thursday, April 20, 2000. On the Friday morning following the burglary, Wright used the pistol to commit a drive-by shooting in a neighborhood near the Shank residence. [FN3] That evening, Wright and Samuel Pitts abducted Green and Felker in Lakeland, drove Green's vehicle approximately fifteen miles to Polk City, and murdered the victims in a remote orange grove. Wright shot one victim with a shotgun, which was never recovered, and the other victim with a pistol that used the same caliber bullets as the gun stolen from the Shank residence. Wright then abandoned the victim's vehicle in a different orange grove in Auburndale. In nearby Winter Haven, Wright used the Shank pistol in a carjacking that occurred during the morning hours on Saturday, April 21, 2000. That afternoon, law enforcement

responded to a Lakeland apartment complex based on reports of a man matching Wright's description brandishing a firearm.

> [FN3]  For the drive-by shooting, Wright was convicted of attempted second-degree murder and two counts of attempted felony murder.

When an officer approached, Wright fled, but he was eventually arrested in the neighboring mobile home park.  Ammunition matching the characteristics of the ammunition stolen from the Shank residence was found in his pocket.  The stolen pistol was also recovered near the location where Wright was arrested.  Almost a week later, the bodies of the victims were discovered.  Thus, the following facts are presented in chronological order to demonstrate the geographical nexus of the offenses and to provide a complete picture of the interwoven events surrounding the double murders.

### The Crime Spree

### <u>The Shank Burglary: Thursday, April 20, 2000</u>

On Thursday, April 20, 2000, Wright unlawfully entered a Lakeland home with two accomplices.  Wright testified that they separated to search the house for items to steal.  In one bedroom, Wright found and handled a plastic bank filled with money.  One of his accomplices discovered a 12-gauge, bolt-action Mossberg shotgun and a loaded Bryco Arms .380 semi-automatic pistol with a nine-round clip in another bedroom. . . .  The accomplice also found four shells for the shotgun in a dresser drawer.  In exchange for marijuana, Wright obtained possession of the pistol from the accomplice.

When Mark Shank returned home after work to discover his firearms missing, he notified the Polk County Sheriff's Office of the burglary.  The Sheriff's Office lifted latent prints from the house, including several from the plastic bank.  An identification technician with the Sheriff's Office matched the latent palm print lifted from the plastic bank to Wright's palm print, confirming that Wright was inside the house where the Shank firearms were stolen.  The following day, Wright used the stolen pistol during a drive-by shooting in a nearby Lakeland neighborhood.

## The Longfellow Boulevard Drive-By Shooting: Friday, April 21, 2000

At approximately 9 a.m. on Friday, April 21, 2000, Carlos Coney and Bennie Joiner observed a black Toyota Corolla approaching slowly on Longfellow Boulevard as they were standing outside a nearby house. Wright and Coney had been embroiled in a continuing dispute since their high school days. Joiner made eye contact with Wright, who was sitting on the passenger side. The car made a U-turn and slowly approached the house again. Wright leaned out the passenger side window and fired multiple shots. One bullet struck Coney in his right leg. Coney's neighbor carried the wounded man to a car and drove Coney and Joiner to a Lakeland hospital where a .380 caliber projectile was removed from Coney's leg.

While Coney was being treated at the hospital, crime-scene technicians collected cartridge casings and projectiles from the Longfellow Boulevard scene. Two projectiles had entered the house and lodged in the living room wall and table. One spent .25 caliber casing and three spent Winchester .380 caliber casings were recovered from the driveway and the street. The projectile recovered from Coney's leg and the one removed from the living room table were fired from the .380 pistol stolen from the Shank residence. [FN5] The recovered casings definitely had been loaded in the stolen pistol, but the firearms analyst could not state with precision that they had been fired from the pistol because the casings lacked the necessary identifying characteristics.

> [FN5] However, a .380 handgun could not have fired the .25 caliber bullet. No explanation for the different shell casing was presented at trial, though it was implied by the defense that an exchange of gunfire occurred between Wright and the victims. Coney and Joiner denied having a firearm at the Longfellow Boulevard residence.

Approximately one hour after the drive-by shooting, Wright unexpectedly visited James Hogan at a house in Lake Alfred, Florida. Lake Alfred is approximately fourteen miles away from the

Longfellow Boulevard location. Wright testified that he and an accomplice from the Shank burglary and Samuel Pitts traveled to see Hogan because the accomplice wanted to sell the stolen shotgun. When they arrived, the accomplice attempted to show Hogan the shotgun, but Hogan was not interested. At that point, Wright pulled a small pistol from under the floor mat in the front seat of the vehicle. This placed Wright in possession of the possible murder weapon on the day of the murders.

## The Double Murders in the Orange Grove: Friday, April 21, 2000

The trio remained with Hogan for approximately twenty minutes and then left together to return to the Providence Reserve Apartments on the north side of Lakeland. Wright and Samuel Pitts lived at that apartment complex with Pitts' family and girlfriend, Latasha Jackson. To support his theory of defense that he did not possess the pistol during the time the murders likely occurred, Wright testified that following the drive-by shooting, he informed Samuel Pitts of the details of the shooting. Wright explained that he had an obligation to disclose his actions to Pitts, who was the leader of a gang of which Wright was a member. According to Wright, the drive-by shooting upset Pitts, and Pitts demanded that Wright surrender the pistol. Wright asserted that he complied with Pitts' demand.

According to Wright's testimony, around twilight that Friday evening, a customer messaged Wright to inquire about procuring marijuana. Wright agreed to meet the customer at a supermarket parking lot and started walking toward the store. Shortly after 7:15 that evening, a female friend saw Wright walking down the street and offered him a ride, which Wright accepted. Then, without provocation, Wright said, "I ain't even going to lie, I did shoot the boy in the leg yesterday," more likely than not referring to the Longfellow Boulevard drive-by shooting. When they arrived at the store, Wright exited the vehicle in the supermarket parking lot without further elaboration of the statement.

Some time that night, James Felker and his cousin, David Green, were abducted from that parking lot and murdered. The cousins left Felker's house at approximately 8 p.m. in Green's white

Chrysler Cirrus for a night of bowling.  Both men were carrying at least $100 at that time.

Several witnesses testified that Wright had willingly described the details of the abduction.  Wright had informed the witnesses that he approached Felker and Green in the supermarket parking lot and requested a cigarette.  When they refused, Wright pulled out a pistol and forced his way into the backseat of Green's vehicle.  Wright then ordered Green to drive to the Providence Reserve Apartments, where Pitts entered the vehicle.

As this group left the apartments between 10 and 10:45 p.m., Wright ran a stop sign in the victim's car.  A detective observed the traffic infraction and conducted a tag check as he followed the vehicle.  The tag check reported that the license plate was registered to an unassigned Virginia plate for a blue, 1988, two-door Mercury, which did not match the vehicle to which it was attached.

After receiving this report, the detective activated his emergency lights and attempted to stop the white Chrysler.  The Chrysler sped through another stop sign and accelerated to sixty miles per hour.  The detective remained in pursuit for ten to fifteen minutes before his supervisor ordered the pursuit terminated.  An all-county alert was issued to law enforcement to be on the lookout for the Chrysler.  The identification developed from the pursuit connected Wright to the victim's vehicle on the night of the murders.

R.R., a juvenile who also lived at the Providence Reserve Apartments, testified that Wright informed him that Wright and Pitts drove the victims ten miles from the abduction site to a remote orange grove in Polk City.  When the victims insisted that they had nothing to give the assailants, Wright exited the car.  One of the victims also exited, possibly by force, and Wright shot him.  The other victim then exited, and Wright shot him as well.  While one of the men continued to crawl and moan, Pitts retrieved the shotgun from the trunk and handed it to Wright, who then shot this victim in the head execution-style.  Wright and Pitts abandoned the bodies and drove away in the Chrysler.  [FN6]

[FN6]  Wright testified, to the contrary, that after he arrived at the supermarket, he conducted a drug transaction and then visited other apartments in the area to sell more drugs.  After making stops at various apartments, he began walking back to the Providence Reserve Apartments.  While he was walking, Pitts drove up in a white vehicle.  Pitts asked Wright if he wanted to drive, and as Wright walked to the driver's side, he noticed blood on the vehicle.  Wright suggested that they take the vehicle to an apartment to wash it.  Wright testified that it was while they were driving to the apartment that the police chase occurred.

Sometime between 10 p.m. and midnight, Pitts and Wright drove the Chrysler to a Lakeland apartment complex to wash blood spatter off the vehicle.  When they arrived at the apartment, Pitts ordered Wright to wash the car while Pitts removed items from the vehicle, including a phone, a black bag, and a Polaroid camera.  Pitts placed the items in his sister's vehicle.  She had arrived with R.R., who testified that when they arrived, Pitts and Wright were acting nervous and scared.  On the ride back to the apartment complex, Pitts told R.R. "that they pulled off a lick and that things was getting crazy."

Wright testified that before Pitts left, he ordered Wright to burn the car and throw the weapon into a lake.  Instead, Wright kept the pistol and later drove back to Hogan's house in Lake Alfred.  Hogan suggested that Wright dump the car in an Auburndale orange grove, and Wright followed that suggestion.

### The Winter Haven Carjacking: Saturday, April 22, 2000

In the vicinity of the Auburndale orange grove where the homicide victim's vehicle was abandoned, Ernesto Mendoza and Adam Granados were addressing a car battery problem in the parking lot of a fast-food restaurant.  It was during those early morning hours of Saturday, April 21, that Wright allegedly approached them, pointed a small handgun at a female with them, and announced that he was going to take the car.  [FN7]  Wright immediately entered Mendoza's vehicle and sped away.  Granados and Mendoza quickly entered a

- 7 -

truck and pursued Wright. The car chase continued through several streets before Wright ran the vehicle onto the curb near a car dealership in Lake Alfred. Wright exited the vehicle, fired several gunshots at Granados and Mendoza, and then escaped across the car lot in the direction of James Hogan's house.

> [FN7] Wright refused to testify about the details of [this] carjacking because he was not charged with this offense.

Several .380 caliber casings were also collected from this scene. These casings were later identified as having been fired from the pistol stolen from the Shank residence. One latent print was lifted from the interior side of the driver's window of Mendoza's car, and three were lifted from the steering wheel. All of these latent prints matched Wright's known fingerprints.

Hogan, whose house was within walking distance of the car dealership from which Wright was seen fleeing, testified that when he returned home at approximately 12:30 a.m. on Saturday, he found Wright seated there. Wright asked Hogan to drive him back to the Providence Reserve Apartments, and on the way there, Wright spontaneously said "they had shot these two boys," and that he had also "got into it with some Mexicans." Wright confessed to Hogan that they had transported two white men to an orange grove and shot both men with a pistol and a shotgun. Wright also confirmed that they engaged in a high-speed chase with police in Lakeland. However, at that point, Wright did not disclose the identity of the other person who aided in the murders.

### The Providence Reserve Foot Chase and Subsequent Investigation: Saturday, April 22, 2000

After Hogan returned Wright to the apartment complex following the Winter Haven carjacking, Wright was observed throughout Saturday handling a pistol at the Providence Reserve Apartments. He also spoke with people regarding the murders. Wright confessed to R.R. that he received a cellular phone from a "lick," meaning it had been stolen. He also described to R.R. the

details of the abduction and murders.  Wright then gave the stolen phone to R.R.

Later that day, Wright was seated with Latasha Jackson on the steps of the apartment building, and Wright had a small firearm resting in his lap.  During their conversation, Wright told Jackson that he shot two white men in an orange grove and that he had shot one in the head.  Soon after this, the police responded to a report of an armed man, who matched Wright's description, at that location.  [FN8]

> [FN8]  Wright was charged with aggravated assault related to this incident, but was acquitted.

A uniformed officer approached Wright and Jackson and stated that he needed to speak with Wright.  Wright jumped over the balcony railing and raced down the stairs.  As Wright ran from the apartment, his tennis shoes fell off.  Jackson picked up the shoes and placed them by the apartment door.  The police later seized these sneakers from the apartment during the murder investigation.  James Felker's DNA was determined to match a blood sample secured from the left sneaker.  Though Wright contended that the shoes were not his and that he had never worn them, both Wright and Pitts were required to try on the shoes.  The shoes were determined to be a better fit for Wright than for Pitts.

Several officers chased Wright from the Providence Reserve Apartments to a nearby mobile home park, which was located across a field from the apartment complex.  During the chase, the officers noticed Wright holding his pants pocket as if he carried something inside.  Wright was arrested at the mobile home park, and his pocket contained live rounds and a box of ammunition containing both .380 Federal and Winchester caliber of rounds.  This was the same caliber ammunition as that recovered from the drive-by shooting, the murders, and the carjacking.

After the police departed, a resident of that mobile home park entered her car to leave for dinner.  Her vehicle had been parked there with the windows down when Wright had been arrested near her front door.  As she entered her vehicle, she discovered a pistol, which was

not hers. This weapon was determined to be the pistol stolen from the Shank residence.

Wright was taken into custody pending resolution of the aggravated assault charges. While Wright was in custody, Auburndale police officers discovered David Green's white Chrysler abandoned in an orange grove. Crime-scene technicians discovered blood on both the exterior of the vehicle and on the interior left side. Four of the blood samples from the vehicle matched James Felker's DNA profile. Further investigation revealed that prints lifted from multiple locations on the vehicle matched known prints of Wright. [FN9]

> [FN9] None of the latent prints lifted from the Chrysler matched the known fingerprints of Pitts or R.R.

A deputy with the Polk County Sheriff's Office linked this abandoned vehicle with a missing persons report for David Green and James Felker. After the vehicle was discovered, the family of the victims gathered at the orange grove to search for any items that might aid in the missing persons investigations. Green had his personal Nextel cellular phone and a soft black bag filled with special computer tools that he utilized for his work in the Chrysler. A Polaroid camera had also been left in Green's vehicle. Green's fiancée discovered her son's jacket in that grove, but Green's workbag, tools, cellular phone, and camera were all missing from the vehicle.

A couple of days after the murders, Pitts attempted to sell the black bag that contained Green's computer tools to a pawnshop. R.R. assisted his stepfather in securing proceeds for the Polaroid camera from another pawnshop. The police had begun contacting pawnshops looking for the items missing from Green's car and recovered the black computer bag and the pawn tickets, which led them to Pitts and R.R. [FN10] Further investigation established that three latent fingerprints from the black bag matched Wright's known fingerprints.

> [FN10] During trial, Green's fiancée identified the Polaroid camera as the one she purchased with Green. She also identified his black workbag.

Following the information obtained from the pawnshop, the police traveled to R.R.'s residence where they identified and seized the Nextel cellular phone Wright had given R.R. The phone seized from R.R.'s residence matched the serial number of David Green's phone. R.R. told the police that Wright, who was still in jail on the aggravated assault arrest, had given him the phone.

A few hours later, a detective questioned Pitts, who revealed the general location of the bodies. Six days following the disappearance of David Green and James Felker, their bodies were discovered in a remote orange grove in Polk City. Each man had been shot three times, and spent bullet cases surrounded the bodies. David Green was face-up, with bullet wounds in his chest and in his head. From his outstretched hand, the police recovered a wallet that contained Green's license. James Felker was face-down in the same area, with three bullet wounds in his head. Green's cause of death was determined to be multiple gunshot wounds to the chest, the forehead, and the back of his neck. A medical examiner removed a projectile from Green's face and a deformed projectile from his throat. Felker's cause of death was determined to be gunshot wounds to the head, one by a .380 caliber projectile to the forehead and two by a shotgun blast to the back of the head. Except for the gunshot wound to Green's chest, any of the gunshot wounds would have rendered the victims unconscious instantaneously.

Law enforcement never recovered the shotgun used in these murders. However, a Florida Department of Law Enforcement firearms expert inspected the pistol recovered from the mobile home park, which was identified as the pistol stolen from the Shank residence, and the firearms-related evidence collected from the various crime scenes. The expended projectiles from the pistol and those found in Wright's possession were of the same caliber but were different brands. Due to the damage sustained by some of the projectiles, the expert was unable to conclusively establish that the pistol stolen from the Shank residence fired all .380 caliber bullets discovered at the scene of the murders. However, the projectiles and the firearm were of the same caliber and displayed similar class characteristics. Five Federal .380 caliber casings discovered near the victims were positively identified as having been fired from the pistol.

Thus, the stolen Shank pistol had likely been used in, and connected with, the Longfellow Boulevard drive-by shooting, the double murders of David Green and James Felker, and the Winter Haven carjacking.

**The Trial**

On October 18, 2004, Wright began his third trial on these charges. . . . The jury returned a guilty verdict on all seven counts and made specific findings that Wright used, possessed, and discharged a firearm, which resulted in death to another. Wright waived his right to have a penalty-phase jury. The jury was discharged after the trial court conducted a thorough colloquy and determined that the waiver was made knowingly, intelligently, and voluntarily.

During the combined penalty-phase and Spencer[ v. State, 615 So. 2d 688 (Fla. 1993),] hearing, the State presented impact statements from the victims' families. The State introduced the certified judgments and sentences from the Longfellow Boulevard drive-by shooting and from two incidents that occurred while Wright was imprisoned prior to the capital trial. [FN13] The State also presented the testimony of the victims of the jail-related felonies. Defense counsel stipulated that the contemporaneous capital convictions supported the aggravating circumstance of a prior violent felony.

> [FN13] Prior to the capital trial, Wright was convicted of two violent felonies while in custody— aggravated battery by a jail detainee and aggravated battery. In the former, Wright, along with several other inmates, attacked another detainee. In the latter, Wright attacked a jail detention deputy.

The defense presented mitigation evidence of Wright's traumatic childhood through the testimony of his family, which included virtual abandonment and neglect by his parents. Two defense expert witnesses testified that Wright's exposure to cocaine and alcohol in utero caused some microcephaly, which is a condition that affects the size of the brain, and mild traumatic injury to Wright's brain. Though one defense expert determined that Wright has

- 12 -

borderline intellectual functioning, including impairments in his frontal lobe functioning for reasoning and judgment, the expert testified that Wright did not satisfy the requirements for statutory mitigation . . . or qualify as mentally retarded under section 921.137, Florida Statutes (2000). . . .

To the contrary, the other defense expert testified that Wright was of low intelligence, which approached that of mental retardation due to fetal alcohol syndrome. In that expert's opinion, Wright could not balance a checkbook, maintain a household, or keep his refrigerator stocked. However, this expert did not consider the recognized standardized intelligence tests required by section 921.137 to be the measure of mental retardation and conceded that under the statutory definition, Wright would not be considered mentally retarded.

A special hearing was held to specifically address whether Wright met the statutory criteria for mental retardation. Wright's scores from each doctor's evaluation fell within the borderline range, but did not drop below 70. Thus, the trial court found that under the statutory requirements, Wright was not mentally retarded. The court noted that there was evidence to the contrary, but held that such evidence did not fall within the purview of the applicable statute.

Following this hearing, the trial court found four aggravating circumstances, three statutory mitigating circumstances, and several nonstatutory mitigating circumstances. [FN16] The trial court concluded that the aggravating circumstances far outweighed the mitigation and that, even in the absence of any individual aggravating circumstance, the trial court would still find that the aggregate of the remaining aggravating circumstances outweighed all existing statutory and nonstatutory mitigating circumstances. Thus, the court imposed a death sentence for each count of first-degree murder and life sentences for each of the five noncapital felonies, all to run consecutively.

> [FN16] The trial court found four aggravating circumstances: (1) Wright was previously convicted of another capital felony or of a felony involving the use or threat of violence to a person (great weight); (2) Wright committed the felony for pecuniary gain (no weight); (3)

Wright committed the homicide in a cold, calculated, and premeditated manner without any pretense of moral or legal justification [CCP] (great weight); and (4) Wright committed the felony for the purpose of avoiding or preventing lawful arrest (great weight).

The trial court found three statutory mitigating factors and gave them some weight: (1) Wright committed the offense while under the influence of extreme mental or emotional disturbance; (2) Wright's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; and (3) Wright was 19 years old at the time of the crime. Wright offered approximately 34 nonstatutory mitigating factors, and the trial court found the following: (1) Wright suffered emotional deprivation during his upbringing (some weight); (2) Wright's low IQ affected his judgment and perceptions (some weight); (3) Wright suffered from neurological impairments, which affected his impulse control and reasoning ability (some weight); (4) Wright suffered from low self-esteem (little weight); (5) Wright lacked the capacity to maintain healthy, mature relationships (little weight); (6) Wright had frustration from his learning disability (little weight); (7) Wright lacked mature coping skills (some weight); (8) Wright displayed appropriate courtroom behavior (little weight); and (9) Wright suffered from substance abuse during his adolescent and adult life (little weight).

Id. at 283-91 (some footnotes omitted). On September 3, 2009, we affirmed

Wright's convictions and sentences. See id. at 305.

- 14 -

On November 5, 2010, Wright filed a motion to vacate his judgment and sentence, which he amended on March 9, 2012. A Huff[1] hearing was held on September 6, 2011, to determine which claims merited an evidentiary hearing. An evidentiary hearing was held on October 16-18, 2012, during which Wright presented ten witnesses. The postconviction court denied Wright's amended motion in its entirety on May 22, 2013. Wright appealed.

On May 27, 2014, however, while Wright's postconviction appeal was pending before this Court, the United States Supreme Court issued its opinion in Hall v. Florida, in which it held Florida's intellectual disability scheme unconstitutional insofar as it conditioned presentation of evidence of adaptive functioning on a strict IQ score requirement. See 134 S. Ct. 1986, 1990 (2014). As a result, we relinquished jurisdiction of Wright's case and allowed Wright to file a renewed motion for determination of intellectual disability with the postconviction court, which he did. The postconviction court subsequently granted an evidentiary hearing on the renewed motion. During the evidentiary hearing for this motion, Wright presented six witnesses and the State presented thirteen witnesses. On March 26, 2015, the postconviction court denied Wright's renewed motion. Wright subsequently appealed that order and we reacquired jurisdiction.

---

1. Huff v. State, 622 So. 2d 982 (Fla. 1993).

From his amended motion to vacate judgment and sentences, Wright only appeals the denial of several claims of ineffective assistance of counsel, as well as his claim that the cumulative effect of those errors deprived him of a fair trial.[2] Specifically, with regard to his guilt phase trial, Wright maintains that his counsel were ineffective for failing to impeach two jail house informants and for failing to object to an improper comment made by the prosecutor during closing remarks. With regard to the penalty phase, Wright maintains that his counsel were ineffective for failing to challenge evidence related to a prior conviction presented in aggravation, as well as for failing to adequately investigate and present evidence of mitigation. From his renewed motion for intellectual disability, Wright appeals the finding that he is not intellectually disabled.

This review follows.

---

2. Wright does not appeal the denial of his other claims. With regard to the guilt phase, Wright had also claimed that: (1) his counsel were ineffective for failing to object to evidence of other crimes or wrongful acts, for failing to challenge victim family member testimony identifying certain items in evidence as belonging to the victims, for failing to investigate alibi witnesses, for failing to present evidence of fetal alcohol syndrome, and for failing to strike a juror from the jury; (2) the State unconstitutionally withheld exculpatory evidence; and (3) the State unconstitutionally presented conflicting theories to the jury. With regard to the penalty phase, Wright had also claimed that: (1) his counsel were ineffective for failing to assert that he should receive a life sentence due to the superior intelligence of his codefendant; (2) section 945.10, Florida Statutes, unconstitutionally withholds the identity of the execution team members; and (3) Florida's lethal injection protocol is unconstitutional.

## ANALYSIS

**Wright's Renewed Motion for Determination of Intellectual Disability**

The Eighth Amendment to the United States Constitution provides that "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In 2002, the United States Supreme Court interpreted the Eighth Amendment to categorically prohibit the imposition of a death sentence on someone who is intellectually disabled. See Atkins v. Virginia, 536 U.S. 304, 321 (2002) ("Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986))).

State law, however, governs the determination of which defendants are intellectually disabled for purposes of capital punishment. See id. at 317 ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." (quoting Ford, 477 U.S. at 405)). In Salazar v. State, 188 So. 3d 799, 811-12 (Fla. 2016), this Court recently explained Florida's procedures for establishing and reviewing intellectual disability:

> "Florida law includes a three-prong test for intellectual disability as a bar to imposition of the death penalty." Snelgrove v.

State, 107 So. 3d 242, 252 (Fla. 2012). A defendant must establish intellectual disability by demonstrating the following three factors: (1) significantly subaverage general intellectual functioning; (2) concurrent deficits in adaptive behavior; and (3) manifestation of the condition before age eighteen. See Hurst v. State, 147 So. 3d 435, 441 (Fla. 2014) rev'd, Hurst v. Florida, 136 S. Ct. 616 (2016); § 921.137(1), Fla. Stat. The defendant has the burden to prove that he is intellectually disabled by clear and convincing evidence. Franqui v. State, 59 So. 3d 82, 92 (Fla. 2011); § 921.137(4), Fla. Stat. If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled. Nixon v. State, 2 So. 3d 137, 142 (Fla. 2009). In reviewing intellectual disability determinations, this Court has employed the standard of whether competent, substantial evidence supports the trial court's determination. See Cherry v. State, 959 So. 2d 702, 712 (Fla. 2007); Brown v. State, 959 So. 2d 146, 149 (Fla. 2007) ("This Court does not reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses."). "However, to the extent that the [trial] court decision concerns any questions of law, we apply a de novo standard of review." Dufour v. State, 69 So. 3d 235, 246 (Fla. 2011).

In Hall v. Florida, 134 S. Ct. 1986 (2014), the United States Supreme Court invalidated Florida's interpretation of its statute as establishing a strict IQ test score cutoff of 70. Hall explained that "[a]n IQ score is an approximation, not a final and infallible assessment of intellectual functioning," and "[i]ntellectual disability is a condition, not a number." Id. at 2000, 2001. Accordingly, "[the Supreme Court] agrees with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." Id. at 2001.

Following two evidentiary hearings, including one in which Wright was allowed to present evidence of adaptive functioning in accord with Hall, the postconviction court concluded that Wright had not proven that he is intellectually disabled by clear and convincing evidence. As we will explain, not only do we

- 18 -

conclude that the postconviction court's findings are supported by competent, substantial evidence, but we are also convinced that Wright has failed to establish intellectual disability even by a preponderance of the evidence.[3]  Accordingly, we affirm the postconviction court's order determining that Wright is not intellectually disabled.

**Significantly Subaverage General Intellectual Functioning**

As explained above, the first prong under Florida law requires a capital defendant to prove that he or she has an IQ low enough to qualify as having significantly subaverage general intellectual functioning.  In Hall, the United States Supreme Court explained that for purposes of determining intellectual disability as a bar to execution, IQ scores are best evaluated as a range, taking into account the standard error of measurement (SEM) and other factors that can affect the accuracy of the score:

3.  Referring us to Cooper v. Oklahoma, 517 U.S. 348 (1996), Wright also contends that section 921.137(4), Florida Statutes, is facially unconstitutional because the clear and convincing evidence standard creates too high of a risk that he will be mistakenly determined to not be intellectually disabled.  However, in light of our holding today, we need not address this issue.  Moreover, the claim is procedurally barred because Wright raised this claim for the first time in his written closing remarks during the supplemental postconviction evidentiary hearing.  See Deparvine v. State, 146 So. 3d 1071, 1103 (Fla. 2014) ("This argument was not specifically raised in either the initial postconviction motion, the reply to the State's response to the motion, or the amended postconviction motion. Deparvine raised this specific claim for the first time in closing arguments."); Darling v. State, 966 So. 2d 366, 379 (Fla. 2007).

The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. . . . Each IQ test has a "standard error of measurement["] often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. . . . An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing.

. . . .

The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. . . . A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. . . . Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. . . . In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

Hall, 134 S. Ct. at 1995-96 (internal citations omitted).

In this case, the postconviction court considered expert testimony regarding Wright's IQ scores, how the SEM applies to those scores, how the practice effect applies to those scores, how the Flynn effect applies to those scores, and how

Wright's effort may have affected the validity of those scores.[4]  After considering that evidence, the postconviction court found that Wright had not established by clear and convincing evidence that he is of significantly subaverage intellectual functioning.  We agree and further hold that Wright has failed to establish this prong by even a preponderance of the evidence.

Wright has taken a total of nine IQ tests, seven of which were non-abbreviated IQ tests, and all of which reported full-scale IQ scores of 75 or above.  When he was ten years old, Wright took three Wechsler Intelligence Scale for Children (WISC-R) tests, receiving full-scale IQ scores of 76 (February 1991), 80 (April 4, 1991), and 81 (September 11, 1991), respectively.  On August 25, 1997, when Wright was sixteen years old, he took his next non-abbreviated IQ test, a Wechsler Adult Intelligence Scale, Revised Edition (WAIS-R), in which he attained a full scale IQ score of 75.  On July 15, 2005, when Wright was twenty-four years old, he took a Wechsler Adult Intelligence Scale 3rd Edition (WAIS-III) and attained a full scale IQ score of 82.  Ten days later, he took the same IQ test and attained a full-scale IQ score of 75.  Thus, as the postconviction court noted,

—————————

        4.  According to the expert testimony presented, the practice effect refers to a test taker's improvement in scores from taking the same test more than once within a short time period.  The Flynn effect refers to a theory in which the intelligence of a population increases over time, thereby potentially inflating performance on IQ examinations.

- 21 -

every single IQ test that Wright took reported a score of 75 or above, five points above the threshold of 70 utilized under Florida law.

Moreover, the expert testimony in this case makes clear that even when adjusting the IQ scores to account for the SEM, Wright cannot prove significantly subaverage general intellectual functioning by even a preponderance of the evidence. Even taking the most favorable testimony concerning the application of the SEM to Wright's scores, at its lowest point, the most favorable range derived from Wright's scores dips just one point beneath the threshold of 70 required for a finding of significantly subaverage general intellectual functioning. Wright's expert witness, Dr. Kasper, testified that she adjusted all seven of Wright's scores for the SEM and concluded that the most accurate range of scores for Wright was derived from his first IQ examination—a WISC-R yielding a score of 76 in February 1991—because it would be free from practice effect concerns as it was Wright's first IQ test. Not only was the range yielded from Wright's first IQ test the most accurate, but it was also the lowest range. Upon applying the SEM to a 95% confidence interval, the range derived from that score was between 69 and 82. According to Dr. Kasper, given the 95% confidence interval, one could expect Wright to score within that range on nineteen out of twenty IQ test administrations, even taking the practice effect into account for subsequent administrations. Indeed, she testified that all of Wright's subsequent scores fell within that range.

Most notably, however, Dr. Kasper agreed that Wright's score of 82 in 2005 was valid and free of any practice effect concerns, and she conceded that the score of 82 was within the 95% confidence interval she determined from applying the SEM to Wright's first IQ exam. Thus, we cannot conclude that Wright has satisfied this prong by even a preponderance of the evidence.

Strengthening our confidence in this result, the State's expert witness, Dr. Gamache, testified that he had concerns that Wright had malingered or not offered a full effort on all of his IQ tests. He reached this conclusion because in administering an IQ test to Wright, he also administered a Validity Indicator Profile test, which indicated that Wright did not expend a full effort.[5] From this experience, Dr. Gamache determined that Wright may have been malingering on all of his previous IQ exams because Wright had never been given a validity test during previous IQ exam administrations. Dr. Gamache explained that although Wright's previous evaluators did not detect any malingering, subjective judgment regarding validity of IQ examinations is notoriously poor. Finally, Dr. Gamache testified that although one can malinger and fake a low IQ, one cannot fake a

---

5. In the IQ test administered by Dr. Gamache, Wright scored a 65. However, it is undisputed that this testing was rendered invalid by Wright's scores on the Validity Indicator Profile test administered the same day.

higher IQ. Accordingly, he testified that Wright's highest IQ score of 82 was the most accurate representation of his IQ.

Therefore, Wright has not proven even by a preponderance of the evidence, and certainly not by clear and convincing evidence, that he is of subaverage intellectual functioning. For this reason alone, Wright does not qualify as intellectually disabled under Florida law. See Salazar, 188 So. 3d at 812 ("If the defendant fails to prove any one of these components, the defendant will not be found to be intellectually disabled.").

### Concurrent Deficits in Adaptive Functioning

We further conclude that Wright cannot demonstrate by even a preponderance of the evidence that he suffers from concurrent deficits in adaptive functioning, the second prong of a finding of intellectual disability. In Dufour, we explained what this prong requires:

> As described in section 921.137(1) and rule 3.203(b), the term adaptive behavior "means the effectiveness or degree with which an individual meets the standards of personal independence and social responsibility expected of his or her age, cultural group, and community." The definition in section 921.137 and Florida Rule of Criminal Procedure 3.203 states that the subaverage intellectual functioning must exist "concurrently" with adaptive deficits to satisfy the second prong of the definition, which this Court has interpreted to mean that subaverage intellectual functioning must exist at the same time as the adaptive deficits, and that there must be current adaptive deficits. See Jones v. State, 966 So. 2d 319, 326 (Fla. 2007).

69 So. 3d at 248.

- 24 -

In the past, we have looked to a variety of types of evidence to determine whether a postconviction court's order concerning intellectual disability is supported by competent, substantial evidence. Most commonly, we have relied on a postconviction court's consideration of expert testimony and its credibility determinations with regard to that testimony. See Diaz v. State, 132 So. 3d 93, 121 (Fla. 2013). Likewise, we have relied on a postconviction court's consideration of lay witness testimony and its credibility determinations. On yet other occasions, we have also considered the facts of the underlying crime, including a finding of the CCP aggravating circumstance, as well as a defendant's testimony and other involvement during trial. See Hodges v. State, 55 So. 3d 515, 526-37 (Fla. 2010); Philips v. State, 984 So. 2d 503, 511 (Fla. 2008); Jones, 966 So. 2d at 328. In this case, all of these types of evidence refute that Wright has concurrent deficits in adaptive functioning.

First, there was expert testimony that Wright lacked concurrent deficits in adaptive functioning. Dr. Gamache, the State's expert, testified that Wright does not have concurrent deficits in adaptive functioning after interviewing Wright for five hours, during which time he administered an IQ test to Wright. Taking Wright's low socioeconomic status, lack of education, specific learning disability, and neighborhood culture into consideration, Dr. Gamache concluded that Wright failed to demonstrate sufficient deficits in all three of the accepted broad categories

of adaptive functioning—conceptual skills, social/interpersonal skills, and practical skills.

With regard to conceptual skills, Dr. Gamache acknowledged that Wright has some deficits in reading and writing skills, but attributed them to a lack of education and his specific learning disability diagnosis, rather than intelligence. He also acknowledged that Wright has some deficits in self-direction and the ability to formulate goals or objectives, but none that are significant.

Ultimately, however, Dr. Gamache concluded that Wright's deficits in conceptual skills do not rise to the level required for a determination of intellectual disability because he observed that Wright: (1) rewrites draft blog entries in his own words; (2) fully communicates with other prisoners and prison staff; (3) listens to others and takes advice, as evidenced by his brief period requesting Kosher meals; (4) understands numbers and time; (5) knows the time allocated for prison activities; (6) manages his prison canteen fund and pays attention to his monthly statements; (7) managed his own funds as an adolescent to buy necessities; (8) conducted basic transactions before he was incarcerated; (9) was attentive to time and number issues during the examination; (10) identifies his attorneys by name and estimates the amount of time they have represented him; (11) knows the difference between legal mail and regular mail in the prison system; (12) understands that he needs his attorneys because he has no legal

training; (13) is receptive to the suggestions of his attorneys; (14) wants his attorneys to prove that he did not commit the crimes for which he was convicted; (15) knows that he was sentenced to death and understands the reasoning for his sentence; and (16) has performed some work on his case.

Likewise, Dr. Gamache did not find that Wright has sufficient deficits with regard to social/interpersonal skills because he observed that Wright: (1) displayed good social skills during his examination and followed written and unwritten rules; (2) interacted effectively during the examination; (3) is able to engage in social conversation with others; (4) has counseled pen pals on how to deal with difficult situations; (5) appears to have adapted well to life on death row, as exhibited by his lack of disciplinary write-ups and ability to ask correctional staff for help; and (6) is able to effectively distinguish between friends and associates, as well as recognize and adapt to multiple levels of interpersonal interaction. Dr. Gamache further testified that Wright denied that he is a victim of exploitation.

Finally, with regard to practical skills, Dr. Gamache observed that Wright (1) cares for his health by showering and grooming daily, as well as by engaging in self-care and health-oriented activities; (2) knows how to obtain the necessities for basic living and follow schedules; and (3) knew how to use public transportation in his community. Furthermore, although Wright did not have a driver's license because he could not pass the written portion of the driving examination, Wright

knew how to drive a car. In addition, Dr. Gamache considered Wright's employment at a grocery store, Wright's gang activity, Wright's drug dealing, and Wright's statements that he lived independently between the ages of thirteen and eighteen.

Even without the testimony of Dr. Gamache, not even Wright's expert, Dr. Kasper, could establish that Wright has concurrent deficits in adaptive functioning. Rather, Dr. Kasper could only conclude that Wright currently has some deficits in the subcategory of conceptual skills, but not in the other categories of practical skills or social skills. Dr. Kasper explained that she twice administered the Adaptive Behavior Assessment Scales (ABAS-II) standardized test for adaptive functioning, which involves answering questions about a person's behavior on a scale of zero to three, zero indicating the person never performs certain behavior and three representing that the person always performs certain behavior. The first ABAS-II administration indicated that Wright had deficits in both conceptual skills and social skills. By Wright's second and most recent administration of the ABAS-II, however, Wright no longer demonstrated deficits in social skills, and therefore only had deficits in conceptual skills. This was the case even after Dr. Kasper adjusted the ABAS-II scores for the SEM. Thus, as Dr. Kasper explained, Wright only met the statutory criteria for intellectual disability with regard to the conceptual skills sub-component of the adaptive skills prong. This is insufficient

for a finding of intellectual disability in the context of this case when it is considered against all of the other significant evidence to the contrary presented, as explained below.

Moreover, Dr. Kasper conceded during cross-examination that her method of administering the ABAS-II was, at best, unorthodox. Although Dr. Kasper interviewed many people with regard to the ABAS-II questions, she filled out just one copy of the ABAS-II and filled in the answers herself by deciding which person's response among many was the most accurate response. She clarified that she would try to confirm the result with other responses and apply the weight of the evidence, but conceded that her response to each question required her to make a credibility determination among all the different responses. As she further conceded, this was not the normal way the ABAS-II is administered, giving us great pause in considering its validity.

Moreover, we need not limit ourselves to expert testimony alone to conclude that Wright does not have concurrent deficits in adaptive functioning. Wright gave extensive testimony during trial, where he told a coherent narrative of his version of the events. He testified at length and was not generally aided by leading questions. Furthermore, following his testimony, he endured a strong cross-examination by the State in which he demonstrated a clear understanding and unwavering invocation of his Fifth Amendment right against self-incrimination

with regard to certain uncharged offenses he was repeatedly questioned about. Moreover, the record demonstrates multiple times that Wright assessed the performance of his counsel across all three of his trials, sometimes expressing dissatisfaction with their inability to elicit certain evidence that had been elicited during a previous trial. In addition, during an extensive colloquy, the trial court judge questioned Wright concerning his waiver of an advisory penalty phase jury and Wright appeared to understand all of the ramifications of such a waiver, a waiver we affirmed on direct appeal. Thus, competent, substantial evidence supports the postconviction court's determination that Wright's testimony during trial and interactions with the trial court refute his alleged deficits in adaptive functioning.

Furthermore, competent, substantial evidence supports the postconviction court's determination that the facts underlying Wright's convictions refute deficits in adaptive functioning. First, the trial court found that Wright committed the murder in a cold, calculated, and premeditated manner. See Philips, 984 So. 2d at 512 ("The actions required to satisfy the CCP aggravator are not indicative of mental retardation."). Specifically, the trial court found, and we affirmed, the findings that Wright had killed his victims execution style. Second, the complexity of the crime spree reflects someone who is likely not intellectually disabled. In addition, the State presented testimony from Aaron Silas, who drove the car during

the Longfellow Boulevard drive-by shooting and testified that Wright instructed him to turn the car around after spotting his victim, someone Wright previously knew.

The State also placed into evidence a transcript of a taped interview with a detective who interviewed Wright following his arrest and presented the detective as a witness. The interview is inconsistent with an intellectually disabled defendant. Wright admitted to running away from the police because he had marijuana in his possession, to discarding the marijuana, and to knowing that possession of marijuana was a crime. Wright was also questioned during the interview about the box of bullets he was carrying, to which he responded, "I think they was .380 bullets," and that he was holding the bullets for a friend. Then, when informed a .380 caliber handgun was found nearby, Wright denied knowledge of the gun. Furthermore, while it was the detective's practice to inquire about mental illnesses when he suspected it may be a concern, he did not feel the need to ask Wright whether he had been diagnosed with any mental illnesses.

Finally, the lay witness testimony from people who know Wright does not dissuade us from concluding that Wright cannot demonstrate concurrent deficits even by a preponderance of the evidence. Although Wright's witnesses testified to general issues, they all ultimately made concessions that suggest Wright lacks concurrent deficits in adaptive functioning. For instance, Wright's cousin

conceded that Wright: (1) had a fast-paced job selecting items for shelving at a grocery store that Wright eventually learned to do on his own, albeit not fluidly; (2) has improved somewhat with regard to grammar and punctuation; (3) writes him cards from prison for the holidays and his birthday; (4) reads the Bible; (5) occasionally calls him on the phone; and (6) has the capacity to learn. Similarly, Wright's aunt conceded that Wright: (1) did not appear to have problems understanding her; (2) did not appear to have problems getting along with other people; (3) was always clean when she saw him; and (4) sent her cards and letters from jail on holidays like Mother's Day, Christmas, Thanksgiving, Easter, and sometimes her birthday.

Furthermore, the State presented the testimony of Samuel Pitts's sisters, Sandrea Allen, Darletha Jones, and Vontrese Anderson, the latter of whom Wright dated for two to three weeks. All three testified that they had known Wright, Wright never had trouble understanding them, and they never had trouble understanding him.[6] All three also testified to having observed Wright ride the city

---

6. One of the State's witnesses, Toya Long Ford, testified that Wright had trouble understanding her and that she had to ask him yes or no questions. However, she further testified that Wright would talk to her about his mother's drug problems and his academic difficulties. Furthermore, Ford testified that Wright would abide by the rules whenever he visited her home and that Wright would come to her for food and safe haven, but also that Wright's visits became less frequent when she and her mother could no longer provide Wright with as much help as they had in the past.

bus to varying degrees. Vontrese also testified that Wright would follow her around after they had ended their relationship, and that even though he was advised by law enforcement to end that activity, he would continue to follow her anyway. She believed Wright knew he was not supposed to follow her, but chose to follow her regardless. Vontrese added that Wright had memorized her phone number and that she received five or fewer jail calls from Wright, but she did not answer them, and that she had received a letter from the jail that appeared to be written by Wright.

Given that Wright has not even demonstrated by a preponderance of the evidence either of the first two prongs for a determination of intellectual disability, we conclude that he has not demonstrated that he belongs to that category of individuals that are categorically ineligible for execution.[7] We therefore affirm the

_____

7. We recognize that the postconviction court suggested that we conduct a new proportionality review due to its concerns that Wright is borderline intellectually disabled. This suggestion, however, is inconsistent with our precedent. See, e.g., McKenzie v. State, 153 So. 3d 867, 884 (Fla. 2014) (denying a new proportionality review in postconviction for evidence the defendant chose not to present during the penalty phase); Lukehart v. State, 70 So. 3d 503, 524-25 (Fla. 2011) (denying a new proportionality review in a petition for habeas corpus); Green v. State, 975 So. 2d 1090, 1115 (Fla. 2008) (denying a new proportionality review due to a lack of new evidence); Farina v. State, 937 So. 2d 612, 618 (Fla. 2006) (proportionality claim procedurally barred in postconviction). Moreover, Wright has failed to brief how a new proportionality review would apply to him and has, therefore, waived such a claim. See, e.g., City of Miami v. Steckloff, 111 So. 2d 446, 447 (Fla. 1959) ("It is an established rule that points covered by a decree of the trial court will not be considered by an appellate court unless they are

postconviction court's determination that Wright is not among those intellectually

disabled defendants that cannot be executed.

**Wright's Amended Motion for Postconviction Relief**

**Hurst v. Florida**

Prior to oral arguments in this matter, the United States Supreme Court

issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016).  The Supreme Court

held that the Sixth Amendment requires a jury to make the findings of fact

necessary to impose death.  See id. at 619 ("The Sixth Amendment requires a jury,

not a judge, to find each fact necessary to impose a sentence of death.  A jury's

mere recommendation is not enough.").

Although Wright validly waived his right to a penalty phase jury during trial,

he nevertheless made a facial claim that Florida's death penalty scheme is

unconstitutional based on Ring v. Arizona, 536 U.S. 584 (2002).  At the time, we

declined to address Wright's Ring claim because we concluded that his waiver of a

penalty phase jury was valid:

> Wright knowingly, intelligently, and voluntarily waived his right to a
> penalty-phase jury, as evidenced by the trial court's colloquy with
> Wright during which the trial court explained the impact of a waiver
> and specifically informed Wright of the consequences on appeal.
> Wright confirmed that it was his knowing intention to waive his
> penalty phase jury.  The trial court concluded that the waiver had been
> made after a full consultation with counsel, that it appeared to be a

properly raised and discussed in the briefs.  An assigned error will be deemed to
have been abandoned when it is completely omitted from the briefs.").

tactical decision on the part of the defense based on counsel's statements, and that the waiver was knowingly, intelligently, and voluntarily made.

Wright does not present any evidence contrary to the finding of the trial court. In fact, Wright concedes that he waived his right to a penalty-phase jury, thus barring this claim, and submits that the waiver was a strategic decision based on the possible "contamination" of the jury by the trial court's admission of collateral-crime evidence during the guilt phase. Wright chose the trial court to be the finder of fact because it was his view that the trial court would be more likely to dispassionately consider the aggravating and mitigating circumstances in light of any emotional impact the collateral-crime evidence may have had on the guilt-phase jury. This is no different from the choice that every capital defendant must make when deciding whether to waive the right to a penalty-phase jury. Wright's strategic decision to present the penalty phase of the case to the trial court instead of a jury constitutes a knowing, intelligent, and voluntary waiver and a conscious abandonment of any <u>Ring</u>-based challenges to the constitutionality of Florida's capital-sentencing scheme.

<u>Wright</u>, 19 So. 3d at 297-98. Nevertheless, prior to oral argument in this case, we <u>sua sponte</u> ordered the parties to file supplemental briefs discussing any application of <u>Hurst v. Florida</u> to his case.

Although Wright did not challenge the validity of his waiver of a penalty phase jury on direct appeal, he now attempts to challenge it on two bases. First, Wright contends that he waived his right to an <u>advisory</u> jury, rather than the jury required by the Sixth Amendment under <u>Hurst v. Florida</u>. Wright bases this contention on the fact that the trial court repeatedly referenced the advisory jury, rather than a jury in general terms. However, this reasoning is undermined by his

- 35 -

attorney's explanation on the record during trial that Wright preferred that the judge determine whether a death sentence was appropriate because he felt that a judge would be more objective than the same jury that convicted him. Second, Wright challenges the validity of the waiver based on his alleged intellectual disability. However, as affirmed above, Wright is not intellectually disabled under Florida law.

Having reaffirmed the validity of Wright's waiver, we conclude that he is not entitled to any Hurst v. Florida relief. See Mullens v. State, 197 So. 3d 16, 38-40 (Fla. 2016) (declining to grant Hurst v. Florida relief where the defendant had knowingly, voluntarily, and intelligently waived a penalty-phase jury prior to the decision in Hurst v. Florida).

### Penalty-Phase Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of Counsel for his defence." U.S. Const. amend. VI. This right, which was incorporated to the States through the Due Process Clause of the Fourteenth Amendment, includes the right to effective assistance of counsel. See McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970); see generally Gideon v. Wainright, 372 U.S. 335 (1963) (incorporating Sixth Amendment right to assistance of counsel to the States).

However, not all ineffective assistance of counsel is unconstitutional. For this reason, a defendant seeking relief on this basis must establish both that his penalty phase counsel's performance was deficient and that the deficient performance prejudiced him so as to deprive him of a reliable proceeding. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Hoskins v. State, 75 So. 3d 250, 254 (Fla. 2011). Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, reviewing the postconviction court's legal conclusions de novo, but deferring to the postconviction court's factual findings that are supported by competent, substantial evidence. See Mungin v. State, 79 So. 3d 726, 737 (Fla. 2011); Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004).

In Shellito v. State, 121 So. 3d 445 (Fla. 2013), this Court further explained how Strickland applies in the penalty phase context:

> Penalty phase claims of ineffective assistance of counsel are also reviewed under the two-prong test established by Strickland, and "[i]n reviewing a claim that counsel's representation was ineffective based on a failure to investigate or present mitigating evidence, the Court requires the defendant to demonstrate that the deficient performance deprived the defendant of a reliable penalty phase proceeding." Hoskins v. State, 75 So. 3d [at 254]. In determining whether the penalty phase proceeding was reliable, "the failure [of counsel] to investigate and present available mitigating evidence is a relevant concern along with the reasons for not doing so." Rose v. State, 675 So. 2d 567, 571 (Fla. 1996).
>
> "It is unquestioned that under the prevailing professional norms . . . counsel ha[s] an 'obligation to conduct a thorough investigation of

the defendant's background.' " Porter v. McCollum, 558 U.S. 30, 39 (2009) (quoting Williams v. Taylor, 529 U.S. 362, 396 (2000)); see also Hannon v. State, 941 So. 2d 1109, 1124 (Fla. 2006) ("Pursuant to Strickland, trial counsel has an obligation to conduct a reasonable investigation into mitigation."). Moreover, counsel must not ignore pertinent avenues for investigation of which he or she should have been aware. See Porter, 558 U.S. at 40. "[I]t is axiomatic that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " Hurst v. State, 18 So. 3d 975, 1008 (Fla. 2009) (quoting Strickland, 466 U.S. at 691). However, "[c]ounsel's decision not to present mitigation evidence may be a tactical decision properly within counsel's discretion." Hannon, 941 So. 2d at 1124. This Court has found counsel's performance deficient where counsel "never attempted to meaningfully investigate mitigation" although substantial mitigation could have been presented. Asay v. State, 769 So. 2d 974, 985 (Fla. 2000).

. . . .

"Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Hurst, 18 So. 3d at 1013. That standard does not "require a defendant to show 'that counsel's deficient conduct more likely than not altered the outcome' of his penalty proceeding, but rather that he establish 'a probability sufficient to undermine confidence in [that] outcome.' " Porter, 558 U.S. at 44 (quoting Strickland, 466 U.S. at 693-94). "To assess that probability, [the Court] consider[s] 'the totality of the available mitigation evidence . . .' and 'reweig[hs] it against the evidence in aggravation.' " Id. at 41 (quoting Williams v. Taylor, 529 U.S. [at 397-98].

121 So. 3d at 453-56.

**Failure to Adequately Investigate or Present Mitigation**

With regard to the penalty phase, Wright first contends that his trial counsel

were ineffective in failing to adequately present evidence of mitigating

circumstances. Although Wright may not be intellectually disabled for purposes of the categorical prohibition against execution under the Eighth Amendment, he can potentially demonstrate that his low IQ and mental health are mitigating circumstances sufficient to outweigh the aggravating circumstances. As a result, Wright contends that his penalty phase counsel were ineffective because they failed to: (1) acquire documents; (2) present lay witnesses; and (3) present expert witnesses demonstrating his low IQ and mental health as mitigating circumstances. We conclude that these claims are without merit.

Failure to Acquire Documents

During the postconviction evidentiary hearing, Wright's postconviction counsel presented Wright's complete school records, which included records from both Florida and New York. The records indicated that Wright had several Independent Education plans and that Wright was both emotionally handicapped and specific learning disabled. In addition, the records contained two school psychological reports that contained IQ scores. Wright contends that his penalty phase counsel were ineffective for relying on a family member for Wright's educational documents in lieu of acquiring all of the school records directly from the schools. We disagree.

Notwithstanding any deficiency, competent, substantial evidence supports the postconviction court's findings that Wright cannot establish Strickland

prejudice.[8]  To establish prejudice, Wright must demonstrate a reasonable probability that he would have received a life sentence but for the deficiencies of counsel.  See Gaskin v. State, 822 So. 2d 1243, 1250 (Fla. 2002).  Wright has not carried his burden because the documents would have merely been cumulative to the information that was presented during the penalty phase.  See Diaz, 132 So. 3d at 111-12 ("A defendant is not prejudiced by trial counsel's failure to present cumulative evidence." (citing Farina, 937 So. 2d at 624)).  Dr. Sesta testified during the penalty phase that he reviewed school records indicating that Wright took classes for emotionally handicapped students and had a learning disability. Wright's family members who testified during the penalty phase corroborated that information as well.  They also added that Wright's mother was receiving social security benefits for Wright's disability.  Therefore, Wright has not alleged any new information contained in the documents that was not previously presented. See id. at 111 (affirming postconviction court's finding of no prejudice for failure to acquire documents where the defendant "[did] not identify any specific facts contained in the documents that should have been brought to the attention of the

---

8. Both parties appear to have conceded that the failure to acquire all of Wright's school documents constituted deficient performance.  The postconviction court did not address deficiency in its order.  Notably, however, penalty phase counsel testified that he believed that the school records demonstrated that Wright was not intellectually disabled, but merely a misbehaving student.

judge . . .”).  Thus, Wright cannot demonstrate that he was prejudiced by the

failure to acquire documents, and this claim fails.  See Evans v. State, 946 So. 2d

1, 12 (Fla. 2006) (“[B]ecause the Strickland standard requires establishment of

both [deficient performance and prejudice] prongs, when a defendant fails to make

a showing as to one prong, it is not necessary to delve into whether he has made a

showing as to the other prong.” (quoting Whitfield v. State, 923 So. 2d 375, 384

(Fla. 2005))).

Presentation of Expert Witnesses

Wright contends that his penalty phase counsel were ineffective for failing to

present expert witnesses to discuss the Flynn effect, the practice effect, and Fetal

Alcohol Syndrome as each relates to his IQ scores and intellectual disability.[9]  We

disagree.

As an initial matter, Wright has failed to establish deficiency.  This Court

has repeatedly held that penalty phase counsel is not deficient for relying on

qualified mental health experts, even where postconviction counsel retains an

expert with a more favorable opinion.  See generally Diaz, 132 So. 3d at 93;

---

9. Wright also contends that his penalty phase counsel were ineffective for failing to retain Dr. Sesta as a confidential consultant and presenting him as an expert witness.  However, this claim was not raised in Wright’s amended 3.851 motion and the postconviction court did not address it in its order.  Wright appears to have raised it for the first time on appeal and, as such, it is not preserved for appeal.  See Deparvine, 146 So. 3d at 1103.

- 41 -

Bowles v. State, 979 So. 2d 182 (Fla. 2008); Asay, 769 So. 2d at 986; Jones v. State, 732 So. 2d 313 (Fla. 1999). Wright's penalty phase counsel pursued the presentation of evidence of mitigating circumstances diligently and ultimately retained five expert witnesses. Indeed, trial counsel testified that they specifically retained Dr. Waldman and Dr. Sesta after the original experts did not find that Wright was intellectually disabled. Dr. Waldman was the first expert to conclude that Wright was intellectually disabled. Furthermore, as discussed above, the record reflects that Wright's trial counsel at times believed that Wright was bright, a conclusion that was reasonable in light of Wright's input with regard to objections across the three trials and his extensive testimony. Thus, Wright has not demonstrated deficiency, and this claim fails.

This claim further fails because Wright cannot demonstrate Strickland prejudice. As noted in the discussion pertaining to Wright's renewed motion for intellectual disability, the expert testimony indicated that Wright's first IQ score was his most accurate and that all of his subsequent IQ scores fell in the range derived from his first IQ score after adjusting for the SEM, notwithstanding any practice effect or Flynn effect concerns. Furthermore, there was testimony that Wright's IQ examinations were far enough apart in time that they would not have been affected by the practice effect. Moreover, during the penalty phase Dr.

Waldman testified that Wright was profoundly impaired and he also testified extensively about Wright's Fetal Alcohol Syndrome, as well as Wright's low IQ.

In addition, Wright has failed to demonstrate that any expert testimony would have changed the composition of the mitigating circumstances found. For instance, the trial court found the existence of two statutory mental health mitigating circumstances: (1) that Wright committed the offense while under the influence of extreme mental or emotional disturbance, and (2) that Wright's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. It assigned those two statutory factors some weight. The trial court also found one more statutory mitigating circumstance, that Wright was nineteen years old (some weight), as well as nine nonstatutory mitigating circumstances: that Wright (1) suffered emotional deprivation during his upbringing (some weight); (2) had a low IQ, which affected his judgment and perceptions (some weight); (3) suffered from neurological impairments, which affected his impulse control and reasoning ability (some weight); (4) suffered from low self-esteem (little weight); (5) lacked the capacity to maintain healthy, mature relationships (little weight); (6) was frustrated by his learning disability (little weight); (7) lacked mature coping skills (some weight); (8) displayed appropriate courtroom behavior (little weight); and (9) suffered from substance abuse during his adolescent and adult life (little weight).

Furthermore, the evidence of aggravating circumstances was significant. Two of the aggravating circumstances found, CCP and prior violent felony for the contemporaneous murders, are among the weightiest of aggravating circumstances. See Deparvine v. State, 995 So. 2d 351, 381 (Fla. 2008) ("CCP[] is among the most serious aggravators set out in the statutory sentencing scheme."); Sireci v. Moore, 825 So. 2d 882, 887 (Fla. 2002) (stating that prior violent felony conviction is among the weightiest aggravating circumstances in Florida's capital sentencing scheme). The trial court also found a third aggravating circumstance: that the murders were committed for the purpose of avoiding arrest. All three aggravating circumstances were assigned great weight. As a result, Wright has failed to demonstrate any reason that any expert testimony would have led to a different assignment of weight to the mental health mitigating circumstances and that a reweighing of the aggravating circumstances and mitigating circumstances would result in a life sentence. Thus, Wright cannot establish prejudice.

We therefore conclude that Wright has failed to establish Strickland ineffective assistance of counsel.

### Failure to Present Lay Witness Testimony

Wright contends that his penalty phase counsel were ineffective for failing to present lay witness testimony from fellow inmates who characterized Wright as a

follower, an outcast, intellectually slow, and pugnacious.[10] The postconviction

court found that Wright did not establish either deficient performance or prejudice

with regard to this claim. We agree.

With regard to prejudice, Wright has failed to demonstrate that the evidence

elicited during the postconviction evidentiary hearing would not have been merely

cumulative to the penalty phase testimony of his aunt and cousin. See Diaz, 132

So. 3d at 111-12 ("A defendant is not prejudiced by trial counsel's failure to

present cumulative evidence." (citing Farina, 937 So. 2d at 624)). His aunt and

cousin specifically testified that Wright was a follower, was slow, had low self-

esteem, performed poorly in school, and was enrolled in special classes. They also

testified that Wright's father was in a mental institution and that Wright was

bullied by other children. As a result, Wright has failed to demonstrate that any

new mitigating circumstance would be found or that the existing mitigating

---

10. Wright mentioned other lay witnesses in his postconviction motion, but he never presented them as witnesses during the postconviction evidentiary hearing. Therefore, any claims concerning them are waived. Ferrell v. State, 918 So. 2d 163, 174 (Fla. 2005). Some of them were eventually called during the evidentiary hearing for Wright's renewed motion for determination of intellectual disability, but only after the postconviction court denied Wright's claim of ineffective assistance of counsel.

circumstances would have been assigned more weight. Therefore, this claim fails. See Evans, 946 So. 2d at 12.[11]

**Failure to Challenge Evidence of Aggravation**

Wright claims that his counsel were ineffective for failing to present witnesses to rebut or elaborate on evidence of Wright's prior convictions for batteries that occurred while he was in prison during the pendency of his trial. This claim is meritless. Competent, substantial evidence supports the postconviction court's findings.

First, Wright has failed to establish prejudice. None of the evidence presented during the postconviction evidentiary hearing negates the fact that Wright had previous convictions for battery. Furthermore, even if those prior convictions were omitted, the trial court still considered Wright's contemporaneous convictions for first-degree murder of the other victim, carjacking, kidnapping, and robbery with a firearm in finding the prior violent felony conviction aggravating circumstance. As the postconviction court noted, the contemporaneous convictions were arguably more serious than the convictions Wright claims were not properly rebutted. As explained above, two of the three

---

11. With regard to deficiency, the decision to limit the presentation of lay witness testimony appears in part to have been strategic based on Wright's penalty phase counsel's assessment of the inmate witnesses' credibility, which is a valid strategic reason for foregoing presentation of certain witnesses.

aggravating circumstances found below are among the weightiest aggravating circumstances. See Sireci, 825 So. 2d at 887; Deparvine, 995 So. 2d at 381-82. In addition, the previously undiscovered evidence concerning the attack on Cassada would have been merely cumulative to the concessions elicited from Cassada during penalty phase cross-examination and the evidence presented by Wright's trial counsel. Specifically, evidence was introduced that one other person was convicted in connection with the attack on Cassada, and Cassada conceded that perhaps five individuals attacked him and he did not know whether Wright actually struck him. Thus, because Wright has failed to establish prejudice, we affirm the postconviction court's denial of this claim. See Evans, 946 So. 2d at 12.

Moreover, the record reflects that Wright's trial counsel made a tactical decision to not present the testimony of other inmates concerning Connelly's alleged provocation of Wright. Wright's trial counsel testified that he did not consider the provocation sufficient justification for Wright to attack Connelly, and even if it were, presentation of such evidence would not have changed the fact that Wright was convicted for the attack. Furthermore, Wright's trial counsel represented Wright in the case concerning his attack on Connelly and presented those witnesses in that case. Thus, Wright's penalty phase counsel were well aware of the inmates' testimony when they elected to not present the inmates as penalty phase witnesses. In addition, Wright's lead penalty phase counsel testified

that he did not consider the inmate witnesses to be good witnesses. The decision to not present rebuttal witnesses concerning the prior conviction for attacking Connelly was a reasonable tactical decision. Therefore, the postconviction court's findings that Wright's counsel were not ineffective for failing to present additional witnesses concerning Wright's prior battery convictions are supported by competent, substantial evidence.

**Guilt Phase Ineffective Assistance of Counsel Claims**

Wright first contends that his counsel rendered ineffective assistance of counsel by failing to present witnesses to testify as to the credibility of two jailhouse informants who testified during trial that Wright confessed to the murders. We disagree.

This Court has observed that mere disagreement by a defendant's subsequent counsel with a strategic decision of a predecessor does not automatically result in deficient performance. See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Indeed, reasonable trial strategy appears in a myriad of forms. One example is a trial counsel's decision to not call certain witnesses to testify. See Johnston v. State, 63 So. 3d 730, 741 (Fla. 2011). Although the "sandwich" rule has been repealed since Wright's trial, this Court has held that a valid basis for deciding against calling witnesses to testify is the decision to preserve opening and closing remarks pursuant to the sandwich rule. See Van

Poyck v. State, 694 So. 2d 686, 697 (Fla. 1997). In addition, this Court has concluded that trial counsel's strategy of relying on cross-examination of a witness—in lieu of calling additional witnesses—was sound trial strategy. See Occhicone, 768 So. 2d at 1048. Moreover, a failure to present cumulative evidence—even by mere omission rather than decision—does not constitute deficient performance. See Beasley v. State, 18 So. 3d 473, 484 (Fla. 2009) (citing Darling, 966 So. 2d at 378). These examples of reasonable strategy reflect this Court's observation that "[m]ore [evidence] is not necessarily better." Woods v. State, 531 So. 2d 79, 82 (Fla. 1988).

Furthermore, notwithstanding the deficient performance of counsel, Strickland prejudice does not arise when a defendant's trial counsel fails to present evidence that would have been merely cumulative to evidence that was previously elicited during trial. See Sochor, 883 So. 2d at 784. In the postconviction context, evidence presented during an evidentiary hearing is cumulative where the same evidence was previously elicited during trial through cross-examination. See Ponticelli v. State, 941 So. 2d 1073, 1085 (Fla. 2006). Moreover, as discussed above, the omission of any noncumulative evidence must undermine confidence in the verdict.

Failure to Present Impeachment Witnesses

Competent, substantial evidence supports the postconviction court's findings that Wright has not established deficiency with regard to the decision to not present witnesses to impeach the credibility of Durant or Robinson.  Rather, the record reflects that the decision was the product of reasonable trial strategy.  For instance, trial counsel testified that he felt "Durant was such an easy target and so incredible" that he was not going to look for any witnesses to impeach him.  The record further reflects that trial counsel extensively and successfully cross-examined Durant with the goal of discounting his credibility.  In addition, trial counsel testified that they rejected the presentation of additional witnesses, with Wright's approval, to preserve opening and closing remarks.  Moreover, trial counsel testified that he did not consider inmates to be strong witnesses and that he did not consider their testimony sufficient to justify sacrificing the retention of opening and closing remarks.

Wright also did not suffer prejudice.  As an initial matter, Wright testified that he never confessed to either Durant or Robinson.  Therefore, any testimony concerning the credibility of Durant or Robinson with regard to Wright's alleged confession would have been merely cumulative to Wright's testimony.  Wright's attorneys extensively cross-examined each of them and even if their testimony was completely discredited, there were still other non-prisoner witnesses who testified that Wright confessed to them.  Furthermore, this Court has previously concluded

that prejudice was not established for failure to object to improper guilt phase prosecutorial comments when the evidence of guilt was strong. See Jones v. State, 949 So. 2d 1021, 1032 (Fla. 2006) ("Given the strong evidence of Jones' guilt, including his confession to the murder and his possession of McRae's vehicle and ATM card, our confidence in the guilty verdict is not undermined by the prosecutor's guilt phase comment [that the murder was committed in a heinous, atrocious, and cruel manner.]"). Here, the remaining evidence of guilt was strong because, among other evidence, Wright's fingerprints were found on the car, he possessed the murder weapon, and blood attributed to one of the victims was found on a shoe attributed to Wright. Thus, this claim fails.

### Failure to Object to Prosecutor's Closing Remarks

As a second claim against his counsel, Wright contends that his counsel were ineffective for failing to object to comments made by the State during guilt phase closing remarks. We disagree.

The comments at issue are the following:

He used the gun on Friday. He shot a man with it. He certain[ly] doesn't have any problems shooting people. He shot Carlos Coney.

When you have a carjacking and a murder like this that's senseless, it's an irrational act, and you cannot for the life of you understand why that happened. You'll never understand why T.J. Wright chose to shoot Carlos Coney or chose to shoot Felker and Green. It's—it's an irrational thing to do.

Carlos Coney and Bennie Joiner both know the guy.  <u>He shoots them, a man that he knows.</u>  The man—the police come, he goes, "Yeah, who shot you?"

"T.J. Wright shot me."

. . . .

You know, you can't believe T.J.  This guy wants you to believe that somebody that he has an acrimonious relationship with, they don't get along, he's driving by, sees the guy, has a gun in his car, and tells his buddy turn around and go back, I want to talk to him.

Bull crap.  <u>He wanted to shoot him.</u>  That's why he told [the driver] to turn around.  That's exactly what he did.  <u>He shot him.</u>

. . . .

But the second time, when you look at this map, after he dumped that car on Bolender Road and went and carjacked the Mexicans, he comes up to right there, and that's where he flees.  That's where <u>he shoots at Mr. Mendoza</u> and the owner of the car who's since died in a car accident.  That's where he shoots at him.

<u>Wright</u>, 19 So. 3d at 294 n.18 (emphasis in original).  On direct appeal, we admonished the State for those comments:  "We caution the State that some of the arguments appear to have crossed the line into asserting that Wright's propensity for violence proved that he committed the murders."  <u>Id.</u> at 294.  Ultimately, however, we reviewed the comments for fundamental error.  We concluded that the comments did not rise to fundamental error.

Despite the distinctions between the fundamental error standard and the <u>Strickland</u> prejudice standard, this Court has held that a previous finding upon

- 52 -

appeal that statements by a prosecutor failed to rise to fundamental error precludes a determination of prejudice in the Strickland context. See Chandler v. State, 848 So. 2d 1031, 1046 (Fla. 2003) ("Because Chandler could not show the comments were fundamental error on direct appeal, he likewise cannot show that trial counsel's failure to object to the comments resulted in prejudice sufficient to undermine the outcome of the case under the prejudice prong of the Strickland test."); Sheppard v. State, 62 So. 3d 14 (Fla. 3d DCA 2011) (applying Chandler in a similar context); c.f. Clarke v. State, 102 So. 3d 763 (Fla. 2012) (distinguishing Chandler because the Court had affirmed the direct appeal without a written opinion and therefore did not reveal whether it had found that no fundamental error occurred). Here, as noted above, this Court determined in a written opinion that the comments at issue did not rise to fundamental error. Therefore, Wright cannot now assert, a second time, that he was prejudiced by his trial counsel's failure to object to those comments.

We nevertheless briefly address the merits because Wright takes issue with this Court's previous conclusion that no fundamental error occurred. Wright believes that a concession by appellate counsel was self-serving because his counsel on direct appeal was his trial counsel and, consequently, his appellate counsel did not have an interest in admitting that he rendered ineffective assistance of counsel. However, we conclude that competent, substantial evidence supports

the postconviction court's finding that Wright cannot establish Strickland

prejudice. Here, the record supports the postconviction court's findings that there

was strong evidence of Wright's guilt, including testimony of multiple confessions,

the recovery of his fingerprints at the crime scene, and the recovery of blood of one

of the victims from a shoe connected to Wright. As a result, even if we were to

agree that Wright's counsel were deficient for failing to object, our confidence in

the verdict is not undermined by the comments in this case when they are placed in

context of the overwhelming evidence of guilt. See Jones, 949 So. 2d at 1032.

Thus, this claim fails.

### Cumulative Error

This Court has recognized under unique circumstances that "[w]here

multiple errors are found, even if deemed harmless individually, 'the cumulative

effect of such errors' may 'deny to [the] defendant the fair and impartial trial that is

the inalienable right of all litigants.' " See Hurst, 18 So. 3d at 1015 (citing Brooks

v. State, 918 So. 2d 181, 202 (Fla. 2005) (quoting Jackson v. State, 575 So. 2d 181,

189 (Fla. 1991))); see also McDuffie v. State, 970 So. 2d 312, 328 (Fla. 2007).

However, this Court has repeatedly held that "where the individual claims of error

alleged are either procedurally barred or without merit, the claim of cumulative

error also necessarily fails." Israel v. State, 985 So. 2d 510, 520 (Fla. 2008)

(quoting Parker v. State, 904 So. 2d 370, 380 (Fla. 2005)); see also Griffin v. State,

866 So. 2d 1, 22 (Fla. 2003). In addition, individual claims that fail to meet the Strickland standard for ineffective assistance of counsel are also insufficient to establish cumulative error. See Israel, 985 So. 2d at 520. Moreover, claims of error that have previously been presented to this Court on direct appeal or in postconviction and subsequently rejected cannot form the basis for a valid claim of cumulative error. See Rogers v. State, 957 So. 2d 538, 555-56 (Fla. 2007) (citing Morris v. State, 931 So. 2d 821, 837 n.14 (Fla. 2006); Melendez v. State, 718 So. 2d 746, 749 (Fla. 1998)).

We affirm the postconviction court's findings that Wright has not established that he was deprived of a fair trial due to cumulative errors. As discussed above, with regard to every claim, Wright has failed to demonstrate that the postconviction court erred in finding no Strickland error occurred. As a result, he has not alleged a basis for cumulative error.

## CONCLUSION

We affirm the postconviction court's denial of Wright's renewed motion for determination of intellectual disability and the postconviction court's order denying Wright's rule 3.851 motion. We also determine that Wright is not entitled to relief pursuant to Hurst v. Florida.

It is so ordered.

- 55 -

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur in result.
LAWSON, J., did not participate.

NO MOTION FOR REHEARING WILL BE ALLOWED.

An Appeal from the Circuit Court in and for Polk County,
        Donald G. Jacobsen, Chief Judge - Case No. 532000CF002727A0XXXX

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel-Middle Region,
and Maria Christine Perinetti, Raheela Ahmed, and Donna Ellen Venable,
Assistant Capital Collateral Regional Counsel-Middle Region, Temple Terrace,
Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Stephen D. Ake,
Assistant Attorney General, Tampa, Florida,

        for Appellee